**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joseph Lamont WHITE, Defendant–
Appellant.**

**No. 91–10213.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 1992.

Decided Sept. 8, 1992.

---

Vicki H. Young, Asst. Federal Public Defender, San Jose, Cal., for defendant-appellant.

Marcia J. Allmand, Asst. U.S. Atty., San Jose, Cal., for plaintiff-appellee.

Before: WALLACE, Chief Judge, CHOY, and POOLE, Circuit Judges.

CHOY, Circuit Judge:

Joseph Lamont White was convicted on one count of involuntary manslaughter under 18 U.S.C. § 1112. He appeals that conviction on several grounds. Finding no error in his conviction, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

White was convicted of causing the death of his two-year-old stepdaughter, Jasmine Jones. Jasmine died from severe head injuries she incurred while she was in White's care at a military personnel residence at Fort Ord, California. White's wife Jayne was serving in the Army and stationed at Fort Ord. White was responsible for caring for Ms. White's two children.

In January 1990, White expressed some frustration to Ms. White over his role as caretaker of the children. This frustration allegedly escalated into a threat to kill Jasmine and Ms. White should he have to continue to care for the children.

Just over a week after the threat, White called his wife while she was on duty and told her that Jasmine was "breathing funny" and suffering from convulsions. Ms. White rushed home to find Jasmine unconscious. The Whites rushed Jasmine to the hospital where medical examinations revealed that Jasmine suffered a massive subdural hematoma. Surgeons performed emergency surgery in an unsuccessful attempt to relieve the pressure caused by the massive swelling in the child's brain. After two days in the Intensive Care Unit with no change in Jasmine's condition, doctors removed life support equipment, and she died shortly thereafter.

White was indicted for voluntary manslaughter, 18 U.S.C. § 1112, and assault resulting in serious bodily injury, 18 U.S.C.

§ 113(f). Before trial, White filed a motion *in limine* to exclude the statements he made to his wife that conveyed a threat to kill her and her daughter. After the hearing, the district court denied the motion. The trial that began in January 1991 culminated in a guilty verdict on the lesser included offense of involuntary manslaughter.

The Presentence Report (PSR) was filed in March 1991 and recommended a two-point upward adjustment for obstruction of justice, United States Sentencing Guidelines (U.S.S.G) § 3C1.1, and a two-point upward adjustment for commission of a crime that involved a vulnerable victim, U.S.S.G. § 3A1.1. Judge Ware sentenced White to thirty-six months imprisonment and one year supervised release. He ordered that White pay $2,560 in restitution and that he have no contact with Jayne White absent permission of the court.

## II. DISCUSSION

### A. *Marital Communications Privilege*

White objects to the introduction of the following testimony of Ms. White:

Q: What did Joe say about hurting Jasmine or hurting you?

A: He told me that he was tired of keeping her and if I left him with her again, he would kill her and then he would have to kill me, too.

White argues that this testimony should have been excluded under Federal Rule of Evidence 501.[1] The common law recognizes two separate marital privileges: (1) the "anti-marital facts" privilege which prohibits one spouse from testifying against another during the length of the marriage, *United States v. Bolzer*, 556 F.2d 948, 951 (9th Cir.1977); and (2) the "marital communications" privilege which bars testimony concerning statements privately communicated between spouses, *In re Grand Jury Investigation of Hugle*, 754

1. Rule 501 provides in relevant part:
   Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness [or] person … shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

F.2d 863, 864 (9th Cir.1985). It is the latter privilege that is at issue here.

■■■ This court has counselled that the marital communications privilege must be narrowly construed "because it obstructs the truth seeking process. Use of the privilege in criminal proceedings requires a particularly narrow construction because of society's strong interest in the administration of justice." *United States v. Marashi*, 913 F.2d 724, 730 (9th Cir.1990) (citations omitted). The public policy interests in protecting the integrity of marriages and ensuring that spouses freely communicate with one another underlie the marital communications privilege. *See United States v. Roberson*, 859 F.2d 1376, 1379 (9th Cir. 1988) (citation omitted). When balancing these interests we find that threats against spouses and a spouse's children do not further the purposes of the privilege and that the public interest in the administration of justice outweighs any possible purpose the privilege serve in such a case.

The court held in *Marashi* that when the allegedly confidential communications relate to present or future crimes that involve both spouses, the privilege does not apply. 913 F.2d at 730. The court reasoned that " 'greater public good will result from permitting the spouse of an accused to testify willingly concerning their joint criminal activities than would have come from permitting the accused to erect a roadblock against the search for truth.' " *Id.* (quoting *United States v. Estes*, 793 F.2d 465, 466 (2d Cir.1986)). Similarly, the marital communications privilege should not apply to statements relating to a crime where a spouse or a spouse's children are the victims.

In *United States v. Allery*, 526 F.2d 1362, 1366–67 (8th Cir.1975) our sister circuit reached the same conclusion in a similar case. *Allery* held that the anti-marital facts privilege does not apply where the spouse or his or her children are the victims of the crime because applying the

privilege in such a case is inconsistent with the policies underlying it. *Id.* at 1366. Although *Allery* involved the anti-marital facts privilege, its rationale is applicable here. *See Trammel v. United States*, 445 U.S. 40, 46 n. 7, 100 S.Ct. 906, 910 n. 7, 63 L.Ed.2d 186 (1980) (exceptions to the anti-marital facts privilege are similar to exceptions to the marital communications privilege). Protecting threats against a spouse or the spouse's children is inconsistent with the purposes of the marital communications privilege: promoting confidential communications between spouses in order to foster marital harmony.

It is unnecessary to review each of the steps in *Marashi* to determine if the privilege applies.[2] While proving that the communication meets the three prongs of *Marashi* test may be a necessary condition for application of the marital communications privilege, it is not a sufficient condition when the privilege is inconsistent with long-standing public policy concerns. The district court correctly refused to apply the marital communication privilege in this case.

### B. Jury Instruction on Involuntary Manslaughter

■■■ White asserts that the district court erred by failing to instruct the jury that involuntary manslaughter requires that the defendant act with gross negligence. *See United States v. Keith*, 605 F.2d 462, 463 (9th Cir.1979). Assuming arguendo that § 1112 makes such a requirement, the error was not harmful, and we will not disturb the jury's verdict. The Supreme Court has held that "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). This analysis applies to an erroneous jury instruction. *See Rose*

---

**2.** *Marashi* held that the privilege extends only to (1) words or acts intended as communication from one spouse to another; (2) communication made during a valid marriage, unless the couple has irreconcilably separated; and (3) communications that are confidential. *Id.* at 729–30 (citations omitted).

*v. Clark,* 478 U.S. 570, 580, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986).

Judge Ware did not instruct on gross negligence because the evidence introduced at trial supported only two distinct theories: (1) that Jasmine was injured as the result of an accidental fall through no act of White, or (2) that White caused her injuries in a manner that could only be described as intentional or at least grossly negligent. Under either theory of the case, an instruction on gross negligence was unnecessary. The Supreme Court stated in *Rose,*

> In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not *intend* to cause injury. In that event the erroneous instruction is simply superfluous: the jury has found, in *Winship*'s words, "every fact necessary" to establish every element of the offense beyond a reasonable doubt.

*Rose,* 478 U.S. at 580–81, 106 S.Ct. at 3107 (citations omitted). Reviewing Judge Ware's characterization of the evidence and the entire record, we find that this analysis controls the present case. No rational juror could have found that White was responsible for Jasmine's injuries without also finding that his conduct was at least grossly negligent. Thus no harmful error occurred.[3]

### C. Failure to Give Accidental Death Instruction

■ White argues that the district court erroneously declined his request to instruct the jury on accidental death. The government argues that the district court's decision was not erroneous because the court gave other instructions that adequately covered the defense theory of accidental death.

■ The district court's refusal to instruct on a theory presented by the defense

is error if the defense's theory is legally sound, is not substantially covered by other instructions, and if a failure to instruct would seriously impair the defendant's ability to present a defense. *United States v. Solomon,* 825 F.2d 1292, 1295 (9th Cir. 1987), *cert. denied,* 484 U.S. 1046, 108 S.Ct. 782, 98 L.Ed.2d 868 (1988).

The government relies on *United States v. Springfield,* 829 F.2d 860 (9th Cir.1987). While the *Springfield* instructions were somewhat more extensive than those given in this case, Judge Ware's instructions adequately guided the jury should it have believed White's version of the facts. The instructions stated that White must have inflicted the injury upon Jasmine for him to be guilty of involuntary manslaughter.

Second, the instructions required the jury to find a connection between White's conduct and Jasmine's death. Under White's version of the facts, Jasmine fell off the bed through no action of his. If the jury believed him, this instruction would have required acquittal.

Finally, the instructions required the jury to find that White's actions were unlawful, that they were done without justification or excuse. Taken together these instructions substantially covered White's defense that the death was accidental, and the failure to give the requested instructions did not seriously impair his ability to present a defense. *Solomon,* 825 F.2d at 1295.

### D. Upward Adjustment for Obstruction of Justice

■ The PSR recommended an increase in the offense level by two points under U.S.S.G. § 3C1.1 for "obstruction of justice"[4] based on White's alleged assault on Ms. White on February 15, 1990, approximately two months before he was indicted.

White allegedly entered Fort Ord, in violation of a court order that barred him from seeing his wife, kicked his way into

---

**3.** *United States v. Fesler,* 781 F.2d 384 (5th Cir. 1986) is distinguishable because it was decided before *Clark* and, therefore, did not purport to apply a harmless error analysis.

**4.** Section 3C1.1, as applicable at the time of the offense, stated, "If the defendant willfully impeded or obstructed, or attempted to impede or obstruct, the administration of justice during the investigation or prosecution of the instant offense, increase the offense level by 2 levels."

his former residence, followed Ms. White as she fled to a neighbor's residence, pulled her from that residence, and struck her head on the door. White told Ms. White that he was not responsible for Jasmine's death and spoke to her about her cooperation with law enforcement officials during their investigation.

The application notes to § 3C1.1 stated that "threatening, intimidating, or otherwise unlawfully attempting to influence a ... witness ... directly or indirectly may provide a basis for applying the adjustment." U.S.S.G. § 3C1.1, comment. (n. 1(d)). This commentary applies to the present case. The district court did not clearly err in determining that White's rampage was an attempt to threaten or intimidate Ms. White. This episode, taken as a whole, was calculated to influence Ms. White's opinion of the cause of Jasmine's death and her cooperation with law enforcement officials.

### E. Upward Adjustment for Vulnerable Victim

 The district court made a two-point upward adjustment because White's crime involved a vulnerable victim.[5] White argues as a threshold issue that the adjustment applies only to intentional crimes. *United States v. Cree*, 915 F.2d 352 (8th Cir.1990). Because involuntary manslaughter is not an intentional crime, *United States v. Skinner*, 667 F.2d 1306 (9th Cir.1982), *cert. denied*, 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983), White argues that the district court erred in applying the adjustment to him.

*United States v. Boise*, 916 F.2d 497, 506 (9th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991), forecloses the application of *Cree* in this circuit because it established a rule that crimes against children trigger § 3A1.1 regardless of whether the defendant intentionally selects them due to their vulnerabilities. Moreover, even were we writing on a clean

slate, we would reject *Cree*'s reasoning. The *Cree* court's interpretation of the guideline conflates the *mens rea* required to convict the defendant of the crime and the culpability required to trigger the application of § 3A1.1. Merely because the crime itself was not intentional does not mean that the defendant did not "kn[o]w or should have known that [the] victim of the offense was unusually vulnerable due to age...." § 3A1.1. In this case, White should have known that Jasmine was a vulnerable victim regardless of whether his crime involved the same degree of intent. The district court's adjustment was therefore proper.

AFFIRMED.

---

5. The Sentencing Guidelines provide
   If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by two levels.
   U.S.S.G. § 3A1.1.