**UNITED STATES of America**

v.

**Nicholas MAVROULES.**

**Crim. No. 92–10243–MA.**

United States District Court,
D. Massachusetts.

Feb. 17, 1993.

See also 798 F.Supp. 61.

Tracy A. Miner, Francis X. Bellotti, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for defendant.

Jonathan Chiel, Richard D. Savignano, U.S. Attorney's Office, OCDETF Div., Crim., Boston, MA, for the U.S.

MEMORANDUM AND FIRST ORDER ON DEFENDANT NICHOLAS MAVROULES' MOTION TO SUPPRESS ILLEGALLY OBTAINED EVIDENCE (# 56)

COLLINGS, United States Magistrate Judge.

## I. INTRODUCTION

In August or September of 1985, Andrew Gerakaris ("Gerakaris") tape recorded certain telephone conversations between himself and another, one Alan Karaharis, and between himself and his father-in-law, the defendant Nicholas Mavroules ("Mavroules" or "the defendant"). Pursuant to 18 U.S.C. § 2515, Mavroules seeks to have the tapes of these conversations suppressed from use as evidence at his criminal trial on the grounds that they were made in violation of 18 U.S.C. § 2511.[1]

## II. THE STATUTORY FRAMEWORK

Title 18 U.S.C. § 2511(1) generally prohibits the interception and disclosure of wire, oral or electronic communications. One exception to that general rule is found in subsection (2)(d) of Section 2511, which provides:

It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act

---

**1.** The defendant concedes that the tape recording of the Gerakaris–Mavroules telephone conversation may be used to impeach Mavroules should he choose to testify at trial.

in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d).

Use at trial of the contents of an illegally intercepted wire or oral communication, as well as any evidence derived therefrom, is forbidden pursuant to 18 U.S.C. § 2515.

The federal wiretap statute sets forth the procedure for invoking the prohibition of § 2515 providing that "[a]ny aggrieved person ... may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom ... on the ground that the interception was unlawful." 18 U.S.C. § 2518(10)(a). By definition, an aggrieved person within the meaning of the statute is any "person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11).

## III. THE MOTION TO SUPPRESS

In the present case, Mavroules argues that the Gerakaris–Karaharis and the Gerakaris–Mavroules tape recordings are inadmissible and should be suppressed because they were made "for the purpose of committing any criminal or tortious act" in violation of 18 U.S.C. § 2511(2)(d). Specifically, Mavroules contends that Gerakaris made the tapes for use in extorting money from his (Gerakaris') wife, Deborah A. Gerakaris, who is also the defendant's daughter. The motion to suppress and the government's response thereto raise several issues that need to be addressed.

### A. Standing

The government asserts that Mavroules has no standing to challenge the admissibility of the Gerakaris–Karaharis tape recorded conversation. In other words, Mavroules is not an "aggrieved person" within the meaning of 18 U.S.C. § 2518(10)(a) with respect to that tape. Although the defendant does not admit the point, in all his submissions he has proffered no argument or caselaw to in any way impugn the veracity of that contention.

The reason for this apparent demurrer is obvious. As Judge Keeton has written:

Case law has clearly established that under Title III, as under Fourth Amendment principles, a defendant has standing to assert only his own rights and may not successfully challenge the admissibility of evidence on the ground that it was obtained in violation of another person's rights. *See*, e.g., *Alderman v. United States*, 394 U.S. 165, 171–172, 176, 89 S.Ct. 961, 965, 968, 22 L.Ed.2d 176 (1969); *United States v. Williams*, 737 F.2d 594, 616 (7th Cir.1984) (citing cases), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). Rather, a defendant has standing to challenge electronic surveillance only if he can "show that it was directed at *him*, that the Government intercepted *his* conversations or that the [intercepted] communications occurred at least partly on *his* premises. Unless he can establish one of these events, it is legally irrelevant that the surveillance was unlawful." *United States v. Williams*, 580 F.2d 578, 583 (D.C.Cir.) (emphasis in original), *cert. denied sub nom. Lincoln v. United States*, 439 U.S. 832, 99 S.Ct. 112, 58 L.Ed.2d 127 (1978).

*United States v. Gambale*, 610 F.Supp. 1515, 1521 (D.Mass.1985), *aff'd, United States v. Anguilo*, 847 F.2d 956 (1st Cir. 1988).

With respect to the Gerakaris–Karaharis tape, Mavroules does not contend that it is an "unlawfully overheard conversation[ ] of ... himself or conversations occurring on his premises ...". *Alderman v. United States*, 394 U.S. 165, 176, 89 S.Ct. 961, 968, 22 L.Ed.2d 176 (1968). Absent a showing of either of these two circumstances, Mavroules has no standing to contest the admissibility of the Gerakaris–Karaharis tape. Accordingly, I shall, after completion of other proceedings specified *infra*, recommend that the motion to suppress the Gerakaris–Karaharis tape be denied.[2]

---

**2.** The time for filing objections to this recommendation shall not start to run until the Court

issues a Report and Recommendation which

### B. The Marital Privilege

In support of his motion to suppress the Gerakaris–Mavroules tape recording of a conversation occurring on September 3, 1985, the defendant has submitted the Affidavit of Deborah A. Gerakaris. *See* Exhibit B to # 56. Deborah Gerakaris is the daughter of the defendant and was, at the time the tape was made, the wife of Andrew Gerakaris.

Deborah Gerakaris asserts that she and Andrew Gerakaris were married in July, 1977. Two children were born of this union. The second child was born in 1983. In September, 1985, Andrew purchased a farm in Stockholm, Maine. She states in her affidavit:

Although Andrew Gerakaris demanded money from me and had been abusive toward me prior to 1985, [his] demands for money became more frequent after September, 1985 when he purchased the property in Stockholm, Maine and took on a new intensity. [He] also became more emotionally abusive and physically abusive to me after this date.

\*     \*     \*     \*     \*     \*

After Andrew Gerakaris bought the property in Maine, [he] was always in need of money for something. He always put pressure on me to get the money. He didn't care where. [He] would physically, mentally and emotionally abuse me in every sense of the word until I came up with the money for him.

When I resisted giving [him] money, [he] would tell me that if I didn't get the money for him, he would "take my father down." He told me he had tapes and would use them against my father if he had to. Although I never heard the tapes, and didn't know how many there were, I believed [he] was capable of anything. Although I occasionally went to my father for money, but [sic] I never told him about Andy

\*     \*     \*     \*     \*     \*

As our marriage became increasingly oppressive and [he] became increasingly physically abusive toward me, I began to

will not occur until after the further proceed-

fear for my physical safety. When I threatened to leave him, [he] told me he would come after me and my family. He said he would fix it so that my children would never see their grandfather (my father) again.

\*     \*     \*     \*     \*     \*

When [Andrew Gerakaris] went to prison [in January, 1990], he told me that if I left him while he was in prison, he would have his girlfriend ... use the tapes he had made against my father even if he couldn't do it directly.

For many years I stayed in a loveless, physically abusive and psychologically demeaning marriage because I believed Andrew Gerakaris would make good on his threats to hurt me and take my father down. Although I didn't know what was on the tapes [he] claimed to have, I didn't want my agony and my family's private conversations plastered all over the press. I also didn't want to give my father's political opponents ammunition to use to unseat him or to have my mistakes hurt my father.

# 56, Ex. B, pp. 1–3.

The government takes the position that the Court may not entertain the affidavit because it contains private communications between husband and wife made during the time the couple was married and is thus privileged.

■ Leaving aside for the moment the question of the government's standing to invoke the marital communications privilege, it is clear that Deborah Gerakaris, as the "testifying spouse," has the choice to testify against her husband in federal court. *Trammel v. United States*, 445 U.S. 40, 53, 100 S.Ct. 906, 914, 63 L.Ed.2d 186 (1980). However, the other spouse, in this case, Mr. Gerakaris, has a privilege to prevent the testifying spouse from revealing private marital communications. *United States v. Wood*, 924 F.2d 399, 401–2 (1 Cir., 1991) citing *United States v. Picciandra*, 788 F.2d 39, 43 (1 Cir., 1986) and *United States v. Ammar*, 714 F.2d 238, 258 (3 Cir.), *cert. denied*, 464 U.S. 936, 104

ings outlined *infra.*

S.Ct. 344, 78 L.Ed.2d 311 (1983). To the same effect are *United States v. Estes*, 793 F.2d 465, 466 (2 Cir., 1986) and *Haddad v. Lockheed California Corp.*, 720 F.2d 1454, 1456 (9 Cir., 1983).

■ Like many privileges, the marital communications privilege does have exceptions. It has been held that the privilege may be asserted after the marriage has been dissolved as to communications occurring during the period of the marriage. *In re Grand Jury Investigation of Hugle*, 754 F.2d 863, 865 (9 Cir., 1985). The Supreme Court in *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), noted the "generally accepted rule" that "divorce ... does not terminate the privilege for confidential marital communications" citing Wigmore, *Evidence*, § 2341(2) and 58 Am. Jur., Witnesses, § 379. The fact that the communications are made at the time when the marriage is "deteriorating" does not destroy the privilege. *United States v. Byrd*, 750 F.2d 585, 592 (7 Cir., 1985). However, the Court in the *Byrd* case did refuse to apply the privilege to communications made at a time when the husband and wife were "permanently separated." *Id.* at 593–4.

The Ninth Circuit has refused to follow the "categorical approach" of *Byrd*. *United States v. Roberson*, 859 F.2d 1376, 1381 (9 Cir., 1988). Instead, the Ninth Circuit adopted the approach of the Second Circuit in the case of *In re Witness Before Grand Jury*, 791 F.2d 234 (2 Cir., 1986) requiring an inquiry by the Court to determine whether the circumstances of the permanent separation "... render more or less likely the objective possibility of reconciliation at the time of the communications ..." *Roberson, supra*, 859 F.2d at 1379 quoting from *In re Witness Before Grand Jury, supra*, 791 F.2d at 238.

On the basis of the limited record before me, it appears that Andrew and Deborah Gerakaris did not separate until May, 1991. Accordingly, there can be no claim that the marital communications privilege does not apply because the communications were made at time when the couple was "permanently separated."

■ The next two exceptions deal with what is sometimes referred to as "crime/fraud" exceptions to the marital communications privilege. The first is that the marital communications privilege does not apply in the circumstances in which the communications are made at a time when both the husband and the wife are jointly engaged in criminal activity. *United States v. Picciandra, supra*, 788 F.2d at 43 citing *United States v. Ammar, supra*, 714 F.2d 238 at 258, *United States v. Entrekin*, 624 F.2d 597, 598 (5 Cir., 1980), *cert. denied*, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 350 (1981), and *United States v. Mendoza*, 574 F.2d 1373, 1381 (5 Cir.), *cert. denied*, 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978). *See also United States v. Neal*, 743 F.2d 1441, 1446 (10 Cir., 1984) and *United States v. Marashi*, 913 F.2d 724, 730–1 (9 Cir., 1990). In the instant case, although Deborah Gerakaris claims that the communications by her husband constituted a crime against her, there is nothing to suggest that Deborah Gerakaris was a "participant" in any criminal activity at the time of the communication. Accordingly, the first "crime/fraud" exception is inapplicable to this case.

■ The second exception deals with the situation in which the communication relates to criminal activity being perpetrated by the communicating spouse upon the non-communicating spouse or a child of the non-communicating spouse. Before the Supreme Court in the *Trammel* case held that the privilege against testifying against a spouse at all belonged to the testifying spouse, courts had held that one spouse could not bar the testimony of another spouse if the testimony involved the commission of a crime against the testifying spouse or a child in the household. *United States v. Allery*, 526 F.2d 1362 (8 Cir., 1975) (involving a charge against a husband that he attempted to rape his twelve-year old daughter); *United States v. Smith*, 533 F.2d 1077 (8 Cir., 1976) (planting heroin on wife to avoid detection).

In *United States v. White*, 974 F.2d 1135 (9 Cir., 1992), a case involving an allegation that a husband committed manslaughter by

causing the death of his two-year old step-child, the Court affirmed a trial judge's ruling that permitted the wife to testify that the husband, before the child's death, stated that he was tired of taking care of the child and that if the wife left the child with the husband again, he would kill the child and then kill the wife. *Id.* at 1137.

Relying on the Eighth Circuit's decision in the *Allery* case, the Court held that the marital communications privilege did not apply "... where the spouse or his or her children are victims of the crime because applying the privilege in such a case is inconsistent with the policies underlying it." *United States v. White, supra,* 974 F.2d at 1138 citing *Allery, supra,* 526 F.2d at 1366. Although recognizing that the *Allery* case did not involve confidential communications but rather the pre–*Trammel* privilege of preventing the testimony of a spouse (the "anti-marital facts privilege"), the Court in *White* relied on a footnote in the *Trammel* case which noted that the exceptions "similar" to that set forth in the *Allery* case "... have been found to the confidential marital communications privilege. See 8 Wigmore § 2338." *Trammel v. United States, supra,* 445 U.S. at 46, fn. 7, 100 S.Ct. at 910, fn. 7. Thus, the Court in *White* concluded:

> Protecting threats against a spouse or a spouse's children is inconsistent with the marital communications privilege: promoting confidential communications between spouses in order to foster marital harmony.

> \*     \*     \*     \*     \*     \*

The district court correctly refused to apply the marital communication privilege in this case.

*United States v. White, supra,* 974 F.2d at 1138. *See also Commonwealth v. Gillis,*

358 Mass. 215, 217–8, 263 N.E.2d 437, 439–40 (1970); *Commonwealth v. O'Brien,* 377 Mass. 772, 774, 388 N.E.2d 658, 661 (1979).

■ Applying the law with respect to this exception to the instant case, the Court accepts the allegations of Deborah Gerakaris as true for the purpose of determining the applicability of the exception. In her affidavit, Deborah Gerakaris avers that Andrew Gerakaris threatened her with injury to her father's reputation in order to extort money from her. Andrew Gerakaris' conduct as described would constitute the crime of attempted extortion under Massachusetts General Laws Chapter 265 § 25.[3] The elements of this crime are " '(1) a malicious threat (2) made to a named person (3) of personal injury to some one (4) with intent to extort money.' " *Commonwealth v. DeVincent,* 358 Mass. 592, 595, 266 N.E.2d 314, 316 (1971) (quoting *Commonwealth v. Snow,* 269 Mass. 598, 608, 169 N.E. 542, 546 (1930)); *See also, Commonwealth v. Matchett,* 386 Mass. 492, 499, 436 N.E.2d 400, 405 (1982). The "named person" to whom the threat is made and the "some one" to be injured need not be the same person. *See Commonwealth v. Snow, supra,* 169 N.E. at 543–544. Further, the Massachusetts Supreme Judicial Court has explicitly held

> ... that the emphasis in the crime of extortion is on the wrongful use of fear to compel the victim to surrender something of value to the extortionist ... Simply stated, an injury to a person's reputation is an injury to the person.

*Commonwealth v. Miller,* 385 Mass. 521, 527–8, 432 N.E.2d 463, 467 (1982).

■ Accordingly, since it appears that the communications about which Deborah Gerakaris speaks in her affidavit constitute

**3.** This statute provides:

Whoever, verbally or by a written or printed communication, maliciously threatens to accuse another of a crime or offence, or by a verbal or written or printed communication maliciously threatens an injury to the person or property of another, or any policy officer or person having the powers of a policy officer, or any officer, or employee of any licensing authority who verbally or by written or printed communication maliciously and un-

lawfully uses or threatens to use against another the power or authority vested in him, with intent thereby to extort money or any pecuniary advantage, or with intent to compel any person to do any act against his will, shall be punished by imprisonment in the state prison for not more than fifteen years, or in the house of correction for not more than two and one half years, or by a fine of not more than five thousand dollars, or both.

criminal activity of which she is one of the victims, the marital communications privilege is inapplicable.[4]

### C. The Purpose For Which Gerakaris Taped The Conversation

There is no dispute in this case with respect to the facts (1) that Gerakaris was a party to the Gerakaris–Mavroules conversation[5] and (2) that he was not acting under color of law at the time that he made the tape recording. What is at issue is whether the tape recording falls within the exception to 18 U.S.C. § 2511(2)(d) such that it must be deemed unlawful because made for the purpose of committing a criminal or tortious act.

▮ In the leading case in this Circuit, it was determined that:

... properly interpreted, § 2511(2)(d) forbids the recording of communications between private persons by or with the consent of one of the parties when it is shown either (1) that the primary motivation, or (2) that a determinative factor in the actor's motivation for intercepting the conversation was to commit a criminal, tortious, or other injurious act.[6]

*United States v. Vest*, 639 F.Supp. 899, 904 (D.Mass., 1986), *aff'd*, 813 F.2d 477 (1 Cir., 1987).

In seeking the suppression of the tape, the burden falls upon the defendant to prove by a preponderance of the evidence that the purpose in making the recording was impermissible. *United States v. Vest, supra*, 639 F.Supp. at 907–908. A different standard must be met to demonstrate that an evidentiary hearing on the issue is warranted. The First Circuit has held that "[t]he test for granting an evidentiary

hearing in a criminal case should be substantive: did the defendant make a sufficient threshold showing that material facts were in doubt or dispute?" *United States v. Panitz*, 907 F.2d 1267, 1273 (1 Cir., 1990). Mavroules contends that, at a minimum, he has made this threshold showing such that an evidentiary hearing must be held.

▮ As stated earlier, Mavroules alleges that Gerakaris made the tape of the Gerakaris–Mavroules conversation primarily for the purpose of using it to extort money and other consideration from his wife Deborah.[7] As indicated *supra*, Deborah A. Gerakaris states in her affidavit that:

When I resisted giving Andrew Gerakaris money, Andy would tell me that if I didn't get the money for him, he would "take my father down." He told me that he had tapes and would use them against my father if he had to. He told me that I should go to my old man to get the money he needed. Although I never heard the tapes, and didn't even know how many there were, I believed Andy was capable of anything.

#56, Exh. B, ¶ 6 at p. 2.

And further:

When he (Andrew Gerakaris) went to prison, he told me that if I left him while he was in prison he would have his girlfriend use the tapes he had made against my father even if he couldn't do it directly.

*Id.*, ¶ 8 at p. 3.

The defendant contends that the fact that Gerakaris only approached authorities with the tape after Deborah left him and refused to give him more money supports the

---

**4.** This conclusion obviates any need to consider whether, in fact, Andrew Gerakaris would, if given the opportunity, invoke the privilege. I note, however, that Andrew Gerakaris is not a party to the instant case. Accordingly, if a determination of whether Andrew Gerakaris would invoke the privilege was necessary to a decision of this matter, I would, before considering Deborah Gerakaris' affidavit, provide Andrew Gerakaris the opportunity to claim the privilege.

**5.** For the purposes of this motion only, the defendant assumes the authenticity of the tapes.

**6.** When the statute was amended later in 1986, the final phrase "or for the purpose of committing any other injurious act" was eliminated.

**7.** There is no doubt that extortion or blackmail is an illegitimate purpose under the wiretap statute. *See*, e.g., *United States v. Phillips*, 540 F.2d 319, 325 (8 Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976).

conclusion that the primary purpose in making the recording had been to extort money from his wife.

In response, the government first argues that several circumstances combine to cast doubt upon the credibility of Deborah Gerakaris' statements. It is noted that details such as specific dates of conversations are missing. The absence of any allegation that Deborah either saw the tapes, or inquired of her husband as to their content, is remarked. Further, the government contends that the affidavit must be viewed in the context of all the ongoing litigation among various members of the Gerakaris and Mavroules families, thereby raising a question as to Deborah Gerakaris' motivation in making her allegations.

While the government's points are well taken in the sense that they are factors for the Court to consider and weigh in making a decision on the ultimate issue, they are inadequate to either override or undercut the fact that the defendant has made a sufficient showing to justify an evidentiary hearing. Moreover, although the government further argues that Deborah Gerakaris' affidavit does not establish her husband's motives in making the tape as a matter of law, it is sufficient for the Court to conclude that if credited, it would be sufficient to support an inference that the tape was made for an unlawful purpose. This is sufficient to entitle the defendant to the evidentiary hearing he seeks. I note that findings in the cases which the government cites and upon which it relies were made by the Courts after an evidentiary hearing. *See United States v. Nietupski,* 731 F.Supp. 881, 882 (C.D.Ill.1990); *see also, United States v. Phillips, supra,* 540 F.2d at 326–327.

It is represented that, if a hearing were to be held, Andrew Gerakaris would testify that his motives for making the tapes were for self-protection and accurate recordmaking. In addition, the government anticipates that Gerakaris would deny that he revealed the existence of the tapes to his wife or that he ever used them in any manner, including to extort money from Deborah Gerakaris. This anticipated testimony plainly reveals that material facts with respect to Gerakaris' motives in taping the Gerakaris–Mavroules telephone conversation are in dispute.

## IV. CONCLUSION AND ORDER

Having concluded that the defendant has made a sufficient threshold showing that material facts are in dispute, it is ORDERED that Defendant Nicholas Mavroules' Motion to Suppress Illegally Obtained Evidence (# 56), to the extent that it seeks an evidentiary hearing [8] on the issue of whether the September 3, 1985 conversation between the defendant and Gerakaris was intercepted "for the purpose of committing any criminal or tortious act," be ALLOWED. Counsel are directed to report for a conference on *Thursday, February 18, 1993 at 9:30 A.M.* at Courtroom A (9th floor), John W. McCormack Post Office and Court House, Boston, Massachusetts for the purpose of scheduling the evidentiary hearing to commence on February 22, 1993 or another date that week depending on the Court's and counsel's schedules.