UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 97-1693

 UNITED STATES OF AMERICA,

 Appellant,

 v.

 STEPHEN M. RAKES,

 Defendant, Appellee.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Reginald C. Lindsay, U.S. District Judge] 

 

 Before

 Selya, Circuit Judge, 

 Aldrich, Senior Circuit Judge, 

 and Boudin, Circuit Judge. 

 

Richard L. Hoffman, Assistant United States Attorney, with whom 
Donald K. Stern, United States Attorney, and James D. Herbert, 
Assistant United States Attorney, were on brief for the United States.
Michael F. Connolly with whom Francis X. Bellotti, Valerie B. 
Robin and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. were on 
brief for appellee.

 

 February 11, 1998
 

 BOUDIN, Circuit Judge. In May 1996, Stephen Rakes was 

indicted by a federal grand jury and charged with perjury and

obstruction of justice. Prior to trial, Stephen Rakes moved

to suppress conversations between him and his former wife,

Julie Rakes, and between him and his one-time attorney, John

P. Sullivan. The district court granted the motion, except

for one conversation, and the government now appeals.

 The facts are readily gleaned from testimony taken by

Judge Lindsay in an in camera hearing on the motion to 

suppress.1 Stephen and Julie Rakes were married in 1978 and

engaged in various business ventures together. In 1983, with

the help of their attorney, John Sullivan, the Rakes couple

established a corporation named Stippo's, Inc., as their

jointly owned company to operate a liquor store business at a

site on Old Colony Avenue in South Boston. The store opened

shortly before Christmas 1983.

 The government believes that not long thereafter, the

Rakeses were threatened by unnamed people in South Boston who

were angry that the Rakeses were underpricing competitors.

Then, in early January 1994, the government believes that

James "Whitey" Bulger visited Stephen Rakes at home while

Julie was at the liquor store and threatened to kill Stephen

  

 1The hearing was conducted in camera to avoid public 
disclosure of the assertedly privileged materials, and the
briefs in this court have been filed under seal. This
opinion was filed under seal and the parties, having now
reviewed it, have no objection to its publication.

 -2- -2-

unless Bulger or his associates were made partners in the

liquor store. By May 1984, again with the assistance of

Sullivan, the Rakeses had transferred Stippo's, Inc., to

another individual, whom the government believes was

associated with Bulger, for a fraction of what the government

says was its real value.

 In May 1991, the government summoned Stephen Rakes

before a federal grand jury in Massachusetts investigating

extortion, racketeering and money laundering. The government

questioned Rakes about the transfer of Stippo's, Inc., to the

alleged Bulger associate. Rakes testified that he had sold

the store to make a profit and because it was too much work,

and said that no one had threatened him to make him sell the

store.

 In September 1995, Stephen Rakes gave similar testimony

before a second federal grand jury. Thereafter, the

government called Julie Rakes and Sullivan before the same

grand jury. Although Sullivan initially refused to discuss

his conversations with Stephen and Julie Rakes, the

government secured an order from district judge compelling

Sullivan's testimony. Stephen Rakes was not advised that the

proceedings to compel Sullivan's testimony were under way.

 In May 1996, the grand jury indicted Stephen Rakes,

charging him with five counts of perjury based on his grand

jury testimony, 18 U.S.C. 1623, and two counts of

 -3- -3-

obstruction of justice, 18 U.S.C. 1503; the obstruction

counts charged that Rakes' grand jury testimony had been

false and intended to obstruct the grand jury. Three counts

of the indictment were later dismissed as multiplicitious but

four others remain pending.

 Asserting the privilege for confidential marital

communications, Stephen Rakes moved to suppress evidence of

conversations in December 1983 and January 1984 between him

and Julie Rakes concerning alleged threats and the sale of

Stippo's. He also asked the court to suppress, on grounds of

attorney-client privilege, conversations between Stephen

Rakes or both Rakeses and Sullivan concerning the sale of

Stippo's, Inc. and the purpose of the sale. The district

court held four days of hearings on the motion.

 In April 1997, the district court granted Stephen Rakes'

motion with one exception: it denied the motion as to one

conversation between Stephen and Julie Rakes, apparently

because it took place in the presence of a third party. The

district court identified the materials to be suppressed but,

presumably because of the risk of disclosure of privileged

information, did not write a supporting opinion or make

separate findings of fact. The government then brought this

interlocutory appeal. See 18 U.S.C. 3731. 

 We will assume arguendo the relevance of the suppressed 

conversations to the government's prosecution. At the same

 -4- -4-

time, most of the formal requisites for the attorney-client

and marital communications privileges are clearly met; the

government's main claim is that the privileges were waived or

forfeited. In a federal criminal case, privileges take their

content from the common law as it may be altered from time to

time in the light of reason and experience. Fed. R. Evid.

501. No brief version of either the marital

communications or attorney-client privilege can be both

complete and accurate. But, broadly stated and subject to

exceptions, the former privilege permits an individual to

refuse to testify, and to prevent a spouse or former spouse

from testifying, as to any confidential communication made by

the individual to the spouse during their marriage.2 The

latter privilege, again with exceptions, protects at the

client's behest confidential communications between lawyer

and client made to facilitate legal services for the client.3

 The communications suppressed by the district court

between Stephen and Julie Rakes were made in the absence of

third parties and in the course of their marriage; that the

  

 2See, e.g., Unif. R. Evid. 504(a); J. Strong, et al., 
McCormick on Evidence 78-86 (4th ed. 1992); Blau v. United 
States, 340 U.S. 332 (1951). The separate marital privilege- 
-to refuse to testify against a spouse in a criminal case--is
not pertinent here. Trammel v. United States, 445 U.S. 40, 
51 (1980).

 3Unif. R. Evid. 502(b); McCormick 87-97; Upjohn Co. 
v. United States, 449 U.S. 383, 389-90 (1981); United States 
v. United Shoe Machinery Corp., 89 F. Supp. 357, 358 (D. 
Mass. 1950) (Wyzanski, J.).

 -5- -5-

Rakeses later divorced is irrelevant, and the government

properly makes nothing of the possibility that one of the

conversations occurred in the presence of their infant

children. Similarly, Stephen Rakes' communications with

Sullivan were made during the course of Sullivan's

representation of Rakes and were related to legal services,

and no one was present except one or both of the Rakeses and

attorney Sullivan. 

 Both the content and context of the communications

support the implicit finding by the district judge that Rakes

intended his conversations, with both his wife and his

attorney, to be confidential. Further, if Stephen Rakes had

been threatened, as the government alleges, he had ample

reason over and above any ordinary interest in privacy to

want them to be kept confidential. We reserve for discussion

below the government's claim that later disclosures by 

Stephen Rakes undermine the claim of confidentiality.

 The government suggests that some general rule deprives

spousal conversations of the privilege if they relate to

financial matters; needless to say, it does not make this

claim in respect to the attorney-client privilege. The

marital communications privilege contains no such limitation:

the cases say, at most, that a discussion of financial

matters between husband and wife may not be intended to be

confidential. E.g., In re Witness Before Grand Jury, 791 

 -6- -6-

F.2d 234, 239 (2d Cir. 1986). In this case, however, the

subjectwas manifestlysensitive,albeit notforthe usualreasons.

 Nor do we agree with the government's suggestion that

communications were not privileged insofar as Stephen Rakes

may have been relating to his wife events that occurred prior

to the communication. It is true that "communications"

privileges typically prevent inquiry into communications and

not into the underlying facts, Upjohn Co. v. United States, 

449 U.S. 383, 395-96 (1981), although the subject is more

complicated than this generalization suggests.4 But the

district court's suppression order was directed to

communications, not to facts, and that is enough for present

purposes.

 This brings us to the main thrust of the government's

argument, namely, that "[t]he suppressed communications are

not privileged because they occurred during an ongoing

extortion scheme." A crime of extortion, says the

government, extends from the initial threat through the

actual obtaining of the property. See 18 U.S.C.  

1951(b)(2); United States v. Bucci, 839 F.2d 825, 829-30 (1st 

Cir. 1988). Here, the government says that the crime

  

 4Where an attorney knows facts only because they were
confidentially communicated by the client, the government
cannot circumvent the privilege by asking the attorney about
"the facts." See Upjohn, 449 U.S. at 395. The same rule 
applies to the marital communications privilege. Blau, 340 
U.S. at 333.

 -7- -7-

extended from the first alleged threat in December 1983

through the completion of the property transfer in May 1984,

a period embracing all but one of the communications that the

government seeks to use.

 No general rule withdraws the privilege from

communications that occur in the same time frame as criminal

act conduct. See In re Grand Jury Subpoenas Duces Tecum, 798 

F.2d 32, 34 (2d Cir. 1986). But both the privileges involved

here are subject to some type of crime-fraud exception.

Thus, the attorney-client privilege is forfeited inter alia 

where the client sought the services of the lawyer to enable

or aid the client to commit what the client knew or

reasonably should have known to be a crime or fraud. E.g., 

Unif. R. Evid. 502(d)(1); McCormick, supra, 95. 

 The counterpart limitation in the case of marital

communications is not necessarily identical; it is expressed

in somewhat different terms in different jurisdictions.5

However, we will assume for present purposes--favorably to

the government--that the privilege for marital communications

  

 5See, e.g., Unif. R. Evid. 504(c); McCormick, supra,  
78. In federal courts, the marital communications privilege
typically is forfeited only where both husband and wife are
jointly engaged in criminal activity or where the victim is
the other spouse or some other family member. See United 
States v. Picciandra, 788 F.2d 39, 43-44 (1st Cir. 1986); 
United States v. Mavroules, 813 F. Supp. 115, 119-20 (D. 
Mass. 1993).

 -8- -8-

would be lost to Stephen Rakes if he made the communications

in question to Julie for the purpose of carrying out a crime.

 The government concedes that Stephen and Julie Rakes

were the "victims" of an extortion scheme. But to invoke the

crime-fraud exception, the government also says (the emphasis

is ours) that "the communications suppressed by the District

Court occurred while the Rakeses were participating in 

carrying out the [extortion] scheme and covering it up, and 

while Stephen was persuading Julie to do so." This, says the

government, entails loss of the privilege.

 Yet, on the government's own version of events, the

Rakeses were not participants in the extortion in any

capacity other than that of victim. The Rakeses were

participants only in the very specialized sense that the

victim of a robbery "participates" by handing over his wallet

under threat of violence, or the victim of a rape

"participates" by offering no further resistance when

resistance appears futile or dangerous. This is not the kind

of participation in an offense that, in our view, vitiates

the privilege.

 It is no accident that the government's case law is

remote from the present facts and consists of cases where one

spouse enlisted a second spouse in a criminal venture, e.g., 

United States v. Parker, 834 F.2d 408, 412-13 (4th Cir. 

1987), or a wife knowingly assisted a husband in criminal

 -9- -9-

conduct, e.g., United States v. Picciandra, 788 F.2d 39, 43- 

44 (1st Cir. 1986). Here, even the government shrinks from

flatly asserting that the Rakeses were criminally liable for 

extortion.

 We have considered the government's further suggestion

that Stephen Rakes engaged in misconduct by inducing his wife

not to report the threat against him. It is enough to say

that the fragments of evidence cited do not even approach

misprision of felony or accessory after the fact. The

government's theory would make a criminal of anyone who, as

the victim of a crime or faced with a criminal threat,

resisted a spousal suggestion that the police be called.

 The government's underlying notion may be that the

privilege is lost for any communication that plays a

functional role in a crime--regardless of whether the parties

to the communication are entirely innocent and otherwise

protected by the privilege. On this view, the parents of a

kidnapped child could be compelled to testify after the event

about their intimate conversations with each other concerning

the kidnapping and possible payment of a demanded ransom. It

is not an attractive picture, and it is hard to believe that

the suggestion is seriously intended.

 In all events, it is not the law. Under the crime-fraud

exception, we think that it takes wrongful complicity by the

privilege holder, not innocent or involuntary action, to

 -10- -10-

forfeit the privilege. This is so even though, as with many

applications of privilege, law enforcement may be hampered in

the interest of other values. The victims of kidnapping or

extortion have problems enough; loss of otherwise applicable

privileges is not part of the package. 

 The government's remaining argument is that Stephen

Rakes himself disclosed the alleged threats to others, most

importantly, to one Brian Burke. According to the

government, Rakes had promised to pay Burke for construction

and related work on the liquor store and owed him a

substantial sum. When in early 1984 Burke called about the

debt, the government says that Rakes told Burke in dramatic

terms that he (Rakes) had been forced out of the business.

This, says the government, shows that the information was

never confidential, and, in any event, the disclosure waived

the privilege. 

 The disclosure to Burke is weak, and to us wholly

unpersuasive, evidence that the communications suppressed by

the district court were never intended to be confidential.

For reasons already indicated, there is every reason to think

Stephen Rakes' conversations with Julie Rakes and with

Sullivan were intended to be confidential. The limited

disclosure to Burke, however dramatic, was obviously made to

ward off a debt collection effort and not because Stephen

 -11- -11-

Rakes had any interest in broadcasting information that might

endanger his life.

 The waiver issue is more complicated. Ordinarily,

deliberate disclosure of a privileged communication, where no

privilege protects this further disclosure, waives a

communications privilege. See United States v. MIT, 129 F.3d 

681, 684-85 (1st Cir. 1997). The restriction is directed

against selective disclosures by reserving protection for

only those communications that the privilege holder himself

is prepared to keep confidential. SEC v. Lavin, 111 F.3d 

921, 929, 933 (D.C. Cir. 1997). The restriction is one of

public policy, and applies regardless of the privilege

holder's subjective intent. MIT, 129 F.3d at 684. 

 As already noted, the privileged communication and the

facts recounted within it are two different things. Upjohn, 

449 U.S. at 395. Thus, a client does not normally lose the

privilege as to communications with his attorney merely

because he testifies at trial to the same events discussed

with his lawyer. United States v. El Paso Co., 682 F.2d 530, 

538-39, n.10 (5th Cir. 1982). Here, there is no suggestion

that Stephen Rakes ever told Burke or anyone else about his

communications with Julie or with attorney Sullivan. 

 Nevertheless, we agree that (on a theory of waiver) a

disclosure of information might be so complete as to defeat a

claim of privilege. We so held in United States v. Billmyer, 

 -12- -12-

57 F.3d 31 (1st Cir. 1995), but in peculiar circumstances:

the information had been collected by the attorney for the

client and then voluntarily disclosed in full by the client

to the government; the issue was whether this same

information, already possessed by the government, should also

be made available to the third parties whom the government

was prosecuting.

 The present case is not remotely comparable. The

communications by Stephen Rakes to his wife and his attorney

apparently contained much that was not disclosed to Burke,

whom the government can always call as a witness. Nor, in

contrast to Billmyer, is Rakes making a disclosure to the 

government while trying to withhold the information from

defendants whom the government is trying to prosecute.

Billmyer is the exception, and we have no trouble letting the 

camel's nose into the tent without letting in the camel.

 At oral argument the government accused Rakes of trying

to invoke a "victim's privilege." There is, of course, no

such privilege. A defense of "duress" exists but its

requirements are stringent. See 1 W. Lafave and A. Scott, 

Substantive Criminal Law, 5.3 (1986). In any event, the 

duress defense has not been invoked in this appeal and forms

no part of our decision. We simply agree with the district

court that the suppressed communications were originally

 -13- -13-

privileged, and that there was no later loss of the privilege

as claimed by the government.

 The government's arguments are, as is usual in this

district, presented with skill, and its zeal to pursue an

alleged extortionist is understandable. But skill and zeal

are to be harnessed by common sense. The notion that the

Rakeses could properly be treated as participating in their

own extortion is Orwellian. An appeal for which such a

proposition had to be the linchpin ought never to have been

brought.

 Affirmed. 

 -14- -14-