**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JERRY LEVIS BANKS, SR.,
*Defendant-Appellant.*

No. 07-30130

D.C. No.
CR-06-00051-BLW-
WBS-1

OPINION

Appeal from the United States District Court
for the District of Idaho
William B. Shubb, District Judge, Presiding

Argued and Submitted
May 5, 2008—Seattle, Washington

Filed February 25, 2009

Before: Arthur L. Alarcón, Susan P. Graber, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Rawlinson;
Partial Concurrence and Partial Dissent by Judge Alarcón

## COUNSEL

Dennis M. Charney, Charney and Associates, Eagle, Idaho, for the defendant-appellant.

James M. Peters (briefed), Assistant United States Attorney, Boise, Idaho; and Alexandra Gelber (briefed and argued), United States Department of Justice, Washington, D.C., for the plaintiff-appellee.

## OPINION

RAWLINSON, Circuit Judge:

In this appeal, we determine whether Jerry Levis Banks, Sr.'s (Banks) conviction on multiple counts involving the possession, production, transportation and receipt of images depicting minors engaged in sexually explicit conduct should be reversed based on the denial of his motion to suppress evidence seized pursuant to a warrant, the admission of testimonial evidence provided by Banks's wife alleged to be protected by the marital communications privilege, or the district court's adoption or the application of definitions for

"masturbation" and "lascivious" as they relate to the subject video. We affirm the conviction. The district court did not err when it denied Banks's motion to suppress or in defining and applying the terms "masturbation" and "lascivious." Although the ruling addressing the marital communications privilege was erroneous, the error was harmless.

## I.

## BACKGROUND

This case began when Special Agent Mary Martin (Agent Martin) filed an "Application and Affidavit for Search Warrant." According to the affidavit, a Canadian investigation into child pornography had resulted in the arrest of a Canadian pedophile who admitted to trading child pornography with Banks. The Canadian pedophile also provided evidence that Banks may have created a pornographic video involving Banks's two-year-old grandson.

A warrant issued to search Banks's home for sixteen types of items described in the affidavit. As a result of the evidence seized pursuant to the warrant, Banks was charged with nine criminal counts relating to the possession, production, transportation and receipt of images depicting minors engaged in sexually explicit conduct. Seven of those charges ultimately proceeded to trial.

Prior to trial, Banks moved to suppress the evidence seized pursuant to the search warrant, asserting that the affidavit lacked foundation and specificity. Banks's arguments were rejected by the district court, and a bench trial ensued.

At trial, the government called Banks's wife as a witness. Mrs. Banks primarily testified about her relationship with the minor child in the subject video. She testified that the child was her grandson, with whom she had a close relationship. Mrs. Banks also identified her husband's ring, watch and

couch in the video.[1] Mrs. Banks was asked whether her husband had made any statements regarding a video involving their grandson. Over Banks's objection, Mrs. Banks testified that her husband had admitted to making the video and that he had done so to ensure that "nothing went on in changing the diaper because of past things."

The district court found Banks guilty on all counts, concluding that Banks had created the subject video. The court relied on the testimony identifying Banks's ring, watch and couch, as well as testimony that Banks had admitted changing the child's diaper. The district court also determined that the video contained images of sexually explicit conduct. Specifically, the court concluded that the video depicted the masturbation of a minor child under a definition of masturbation that included the stimulation of genitalia in a manner that would stimulate an adult. The district court found that the video also contained a lascivious exhibition of the genitals of the minor child because it depicted the masturbation of the child "for the purpose of eliciting in the viewer a sexual response."

## II.

## STANDARDS OF REVIEW

We review *de novo* the district court's rulings on a motion to suppress and the validity of a search warrant. *See United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007).

We also review *de novo* legal conclusions regarding the marital communications privilege. *See United States v. Griffin*, 440 F.3d 1138, 1143 (9th Cir. 2006). However, we review the admission of evidence for an abuse of discretion. *See*

---

[1]This testimony was in addition to that of other witnesses detailing that Banks had been left alone with the child, that he had been discovered with the child in the locked garage, and that he had admitted to changing the child's diaper.

*United States v. Marashi*, 913 F.2d 724, 729 (9th Cir. 1990). "A district court abuses its discretion if it 'bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.' " *Shafer v. Astrue*, 518 F.3d 1067, 1070 (9th Cir. 2008) (citation and alteration omitted).

Finally, we review *de novo* the district court's "construction or interpretation of a statute," *United States v. Carranza*, 289 F.3d 634, 642 (9th Cir. 2002) (citation omitted), and review for clear error the court's findings of fact. *See United States v. Leos-Maldonado*, 302 F.3d 1061, 1063 (9th Cir. 2002).

III.

DISCUSSION

A. *The affidavit contained an adequate foundation to support issuance of the search warrant.*

**[1]** Statements in an affidavit supporting a search warrant application directed toward "the behavior of a particular class of persons" must be supported by "a foundation which shows that the person subject to the search is a member of the class." *United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1991), *as amended*. In the present case, there was ample information in the affidavit to support the notion that Banks was engaging in the production and trade of images depicting minors engaged in sexually explicit conduct, including evidence of the transmission of such images between Banks and a convicted sex offender in Canada. Thus, to the extent Banks argues that the affidavit failed to set forth the proper foundation for later assumptions about pedophiles, the requirements of *Weber* were met.

Further, to the extent that Banks argues that the contested sections of the affidavit were required to be supported by expert opinion, he is incorrect. The contested sections pro-

vided background information about how pedophiles act in the digital age, how law enforcement generally conducts searches of computers, and what likely steps would be taken to search a computer. None of these topics is so esoteric as to require expert explanation to be understood. Additionally, at the outset of the affidavit, Agent Martin explained that she has been investigating the sexual exploitation of children since 1998 and has attended training seminars and classes "related to conducting these types of investigations." Her extensive background was sufficient to support the generalized statements provided in the first three sections of the affidavit.

Finally, to the extent Banks argues that Agent Martin's failure to specifically include the source of her information in each section renders the affidavit insufficient to create probable cause, the argument fails because Banks is unable to demonstrate that any omission was material or that, "when supplemented with the omitted information, [the affidavit] would be insufficient to support a probable cause finding." *United States v. Jawara*, 474 F.3d 565, 582 (9th Cir. 2007), *as amended* (citation omitted).

### B.    *The warrant was sufficiently specific.*

"Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006) (citation omitted).

**[2]** "The prohibition of general searches is not . . . a demand for precise ex ante knowledge of the location and content of evidence . . . The proper metric of sufficient specificity is whether it was reasonable to provide a more specific description of the items at that juncture of the investigation." *United States v. Meek*, 366 F.3d 705, 716 (9th Cir. 2004) (citation omitted). The warrant in this matter sought evidence

that Banks was engaged in the production and transmission of child pornography. In doing so, it limited its range to items containing a connection to "child pornography," "child erotica," or "minors engaged in sexually explicit conduct" as defined by statute. This description was sufficiently particular to overcome Banks's argument that the items to be seized were not specifically identified. *Id.*

Banks's contention that the warrant's lack of a time frame rendered it insufficiently particular is unpersuasive because the record and affidavit do not demonstrate knowledge on the part of the government that the illegal conduct was limited to any particular time frame. *Cf. United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) (invalidating a warrant where the affidavit indicated that the criminal activity began at a specific time period but the warrant was not limited to a particular time frame).

Banks's final suggestion that the warrant was insufficiently particular because it did not specifically seek to recover the videos known to have been transmitted and because it failed to identify the name of the internet chat room that Banks moderated also fails. Although the government may have known the name of certain files that supported the finding of probable cause, there is no requirement that the warrant be tailored to obtain only that evidence already known to exist. In fact, this heightened limitation has been specifically rejected. *See Meek*, 366 F.3d at 716.

Banks also challenges the breadth of the warrant, asserting that the items seized could have been described more specifically and that the warrant should have excluded a search of Banks's home-based business.

The affidavit submitted in support of the warrant in this case explained that "computer storage devices . . . can store the equivalent of thousands of pages of information." It also noted that a user wanting to conceal evidence "often stores it

in random order with deceptive file names." The affidavit then noted that searching computers "for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment." Finally, the affidavit provided evidence that computers at the Banks's residence had been used to obtain and transfer child pornography.

**[3]** "[N]o more specific description of the computer equipment sought was possible," *United States v. Hay*, 231 F.3d 630, 637 (9th Cir. 2000) (citation and footnote reference omitted), because there was no way to know where the offending images had been stored. "Further, the affidavit explained why it was necessary to seize the entire computer system in order to examine the electronic data for contraband," *id.*, and the "warrant did not authorize[ ] seizure of every document, but of child pornography which is a sufficiently specific definition to focus the search." *Id.* at 638 (footnote reference omitted).

"A generalized seizure of business documents may be justified" if it is demonstrated that "the government could not reasonably segregate . . . documents on the basis of whether or not they were likely to evidence criminal activity." *Kow*, 58 F.3d at 427, 428 (citations omitted). A full reading of the affidavit in this matter reveals that no more limited search would have been feasible, even if the evidence of Banks's home business had been more fully set forth. As in *Meek*, "the warrant here did not authorize 'the seizure of virtually every document and computer file' without indicating how items were related to the suspected crime." 366 F.3d at 715 (citation omitted) (distinguishing *Kow*). Rather, the warrant sought only evidence of child pornography and appropriately limited its search and seizure provisions to attain this objective. *See id.* at 715-16.

**[4]** Thus, the district court did not err in denying Banks's motion to suppress.

*C.   Although the district court erred in applying the marital communications privilege, the error was harmless.*

Over Banks's objection that the testimony was protected by the marital communications privilege, the district court allowed Banks's wife to testify to statements made by Banks during the course of their marriage concerning why Banks created the video.

**[5]** The marital communications privilege "protects from disclosure private communications between spouses," *Griffin*, 440 F.3d at 1143-44 (citations omitted), and may be invoked by the non-testifying spouse. *Marashi*, 913 F.2d at 729. The privilege exists "to protect the integrity of marriages and ensure that spouses freely communicate with one another." *Griffin*, 440 F.3d at 1143 (citation, alterations and internal quotation marks omitted). However, because the marital communications privilege "obstructs the truth seeking process," its use "in criminal proceedings requires a particularly narrow construction because of society's strong interest in the administration of justice." *United States v. White*, 974 F.2d 1135, 1138 (9th Cir. 1992) (citation omitted).

**[6]** While balancing the public's interest in the full and fair administration of justice and the need to protect the integrity of marriage and ensure that spouses freely communicate, we have created two exceptions to the privilege. First, "the marital communications privilege does not apply to statements made in furtherance of joint criminal activity." *Marashi*, 913 F.2d at 731. Second, "the marital communications privilege should not apply to statements relating to a crime where a spouse or a spouse's children are the victims." *White*, 974 F.2d at 1138. It is the extent of this second exception that we now consider.

In *White*, we agreed with the balancing test set forth by the Eighth Circuit in *United States v. Allery*, 526 F.2d 1362, 1366-67 (8th Cir. 1975), which concluded that an exception

to the marital privilege was needed to protect the children of either spouse from abuse by the other spouse. *Id.* at 1367. The district court's ruling in this case demonstrates its belief that the *White* exception should extend to those individuals considered the functional equivalent of the children protected in *White*.

In determining whether the functional equivalent of a child/parent relationship should support an exception to the marital communications privilege, the rationale of *Allery* is instructive. In *Allery*, the court extended the exception to allow testimony when a crime has been committed against the child of either spouse, recognizing that "in light of today's society," the policy behind the privilege requires expansion of its exceptions. 526 F.2d at 1366. The court noted "that a serious crime against a child is an offense against that family['s] harmony and to society as well." *Id.* The court also discussed that a vast majority of child abuse cases involve "a parent or parent substitute" as the perpetrator. *Id.*

[7] Given that the bond between marital partners and the functional equivalent of their children would be nearly identical to that between marital partners and their birth or stepchildren, the harm to family harmony and society would be the equivalent of that noted in *Allery*. *See id.* Indeed, of the nine states within the Ninth Circuit, seven recognize a marital communications privilege exception including the functional equivalent of birth children or a somewhat broader concept.[2]

---

[2]The states with such an exception are Alaska (*Daniels v. State*, 681 P.2d 341, 345 (Alaska Ct. App. 1984) (covering foster children as well as birth and adopted children)); Arizona (Ariz. Rev. Stat. Ann. §§ 13-4062 & 13-604) (waiving the privilege for several serious offenses including "[a]ny dangerous crime against children" and "[s]exual conduct with a minor under fifteen years of age"); California (*Dunn v. Superior Court*, 21 Cal.App.4th 721, 723-24 (1993) (recognizing that the exception applies to adult step-children as well as all foster children)); Hawaii (Haw. Rev. Stat. § 626-1, Rule 505(c)) (excepting from the privilege crimes committed against "a third person residing in the household of either [spouse]");

Considering the comparable familial ties, we conclude that violence against the functional equivalent of a child should be afforded the same protections as violence against the birth or step-child of a married couple.[3]

The question remains, however, whether the district court correctly concluded that the minor child in this case was the functional equivalent of a birth or step-child. The district court's conclusion was based on the following findings:

> that JB, the alleged victim, was the grandchild of both the witness, Mrs. Banks, and the defendant, Mr. Banks; that the witness and the defendant were married and co-habitating at the time of the communication; that JB was in the care, joint care of Mrs. Banks and the defendant at the time of the alleged molestation; that JB was specifically being cared for by the defendant at the time of the alleged molestation; that at least during the two-month period prior to the alleged molestation that JB had been left in the joint

---

Idaho (Idaho Code Ann. § 9-203(1)) (precluding use of the privilege in "any case of physical injury to a child where the injury has been caused as a result of physical abuse or neglect by one or both of the parents" and "any case of lewd and lascivious conduct or attempted lewd and lascivious conduct where either party would otherwise be protected by this privilege"); Nevada (Nev. Rev. Stat. § 49.295(2)(e)(1)) (excluding crimes committed against "a child in the custody or control of either" spouse); and Washington (Wash. Rev. Code § 5.60.060(1)) (precluding use of the privilege in a "proceeding for a crime committed by said spouse or domestic partner against any child of whom said spouse or domestic partner is the parent or guardian").

[3]We decline to follow the path taken in *United States v. Bahe*, 128 F.3d 1440, 1446 (10th Cir. 1997), extending the exception to testimony relating to the abuse of any minor child in the marital household, whether residing there or visiting. No other circuit has adopted such a broad exemption to the federal marital communications privilege. In fact, such an exception would be broader than that adopted by the majority of states within the Ninth Circuit.

care of the defendant and Mrs. Banks for two week-ends beginning on Friday evening and ending Saturday afternoon; that the parents, i.e., Mr. and Mrs. Banks' son and their daughter-in-law, were not present during those times when JB was in the care of the defendant and his wife.

Further, during the approximate two years of JB's life preceding that time, for the first six months he had lived with Mr. and Mrs. Banks. And during that time, the parents also lived with Mr. and Mrs. Banks, but Mrs. Banks on occasion would feed, bathe, clothe, and change the diapers of JB on many occasions. After that three-month — or after that six-month period, the times in which JB was in Mr. and Mrs. Banks's care was very infrequent until April of 2005. But the parents started leaving JB in the care of Mr. and Mrs. Banks from the time he was about one and one half years old but not usually overnight until April of 2005.

**[8]** Although these facts demonstrate a strong bond between the victim and his grandparents, they do not show the type of relationship that would be considered the functional equivalent of a birth or step-child's relationship with his parents. Infrequent overnight visits are common to a large portion of grandparent/grandchild relationships, as are frequent visits with or even regular day-care services provided by the grandparents. This type of care, while admirable and important, does not carry the same indicia of guardianship and responsibility that a parent/child relationship carries. Further, while the district court noted that JB had resided with the Banks for the first six months of his life, it is an important qualifier that his parents had also resided in the home and that this living situation had ended well over a year before the alleged molestation.

**[9]** This is not a case in which a child was raised by grandparents and, therefore, could be said to share a parent/child

relationship with those caretakers. Rather, this situation demonstrates a strong grandparent/grandchild relationship. Although such a relationship is important to building strong extended families and improving society, it is not the type that creates the same overriding policy concerns that led us to limit the marital communications privilege to protect children of the marriage.

**[10]** Accordingly, the district court's admission of Mrs. Banks's testimony was an abuse of discretion because the district court's finding that JB was the functional equivalent of a birth child to Banks and his wife was clearly erroneous under these facts. *See Shafer*, 518 F.3d at 1070 ("A district court abuses its discretion if it 'bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.' " (citation and alteration omitted)).

Our dissenting colleague accuses the majority of "neglect[-ing] its duty pursuant to Rule 501 of the Federal Rules of Evidence . . ." Dissenting Opinion, p. 2246. To the contrary, it is the dissenting opinion that strays from the dictates of Rule 501 by incorporating wholesale state law statutory privileges into its analysis.

Rule 501 provides in pertinent part: "[T]he privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the *courts of the United States* . . ." *Fed. R. of Evid. 501* (emphasis added). In keeping with Rule 501's emphasis on *federal* common law, the court in *Allery* recognized that "[f]ederal courts *may* . . . look to the privileges created by state courts and applicable state statutes *if the court finds them appropriate*." *Allery*, 526 F.2d at 1365 (emphases added). No deference to state law is mentioned or implied.

More importantly, the court in *Allery* noted that proposed rules of privilege "adopted by the United States Supreme Court and sent to Congress for approval . . . [were] abandoned

by Congress and [were] replaced by Rule 501." *Id.* at 1366 (footnote reference omitted).

In *Allery*, the court explained that "[a] careful review of the legislative history behind the rejection of the changes proposed in Article V and the passage of Rule 501 does not indicate that Congress disapproved of the expansion of this exception but rather that any substantive changes should be done on a case-by-case basis." *Id.* (citation omitted).

Rather than resolving this case on these facts, the dissent seeks to make a sweeping ruling that the marital privilege is waived for all grandparents for all time for all circumstances, whenever a charge of sexual abuse of a minor is involved. Although the majority recognizes the abhorrent nature of child sexual abuse, we must nevertheless faithfully apply our precedent.

Our governing precedent on this issue is our opinion in *White*, which cited *Allery* with approval. *See White*, 974 F.2d at 1138. In *White*, we concluded that the common law "marital communications privilege should not apply to statements relating to a crime where a spouse or spouse's children are the victims."

The dissent seeks to extend this holding virtually without limitation. *See* Dissenting Opinion, p. 2256-57. In doing so, the dissent goes far beyond the approach taken by the district court. It is apparent from the district court's factual findings that its ruling was predicated upon a determination that the grandparents in this case were the functional equivalents of parents. Indeed, the district court expressly reasoned that this case was "not even a small step from what the court ruled in *White*. It is almost exactly the same." In this particular case, under these particular facts, we disagree. Perhaps our holding would be different if the grandparents were the primary caregivers. But such was not the case. Rather, the grandparents were occasional caregivers. As discussed above, and as Rule

501 contemplates, a case-by-case application of the marital communications privilege as interpreted by our court, leads the majority to conclude that the exception did not apply in this case.[4]

[11] Nevertheless, evidence improperly admitted under the marital communications privilege warrants reversal only if it affected the defendant's substantial rights. *Marashi*, 913 F.2d at 729. The error here was harmless as it related to the issue of Banks's identity. In fact, the district court's finding that Banks created the video made no mention of Banks's confession to his wife. Rather, the court focused on the multitude of evidence supporting the conclusion that Banks made the video. This evidence included the recognition of Banks's watch and ring on the adult in the video; the recognition of a couch in the video that was owned by Banks and kept in his garage; testimony that Banks had been found in his locked garage, alone with the victim, and had admitted to changing the child's diaper; and testimony that Banks had been left alone with the child. This evidence demonstrated beyond a reasonable doubt that the video was made in Banks's garage and that Banks had been involved in the making of the video. We are persuaded beyond a reasonable doubt that the district court would have found that Banks made the video, even without the improperly admitted statement.

Any error was also harmless as it related to the district court's finding that the video constituted sexually explicit conduct. Although the district court did discuss the competing

---

[4]The dissent quotes at length from the district court's reasoning to support the argument that the marital privilege exception should be expanded. Dissenting Opinion, pp. 2270-72. It is notable that the portions quoted by the dissent anchor the district court's reasoning to our precedent, *White*, rather than to Idaho law or any other state statutory or case authority. Although the district court referenced state law generally, it did not seek to incorporate state law into its analysis, and rightfully so. *See Allery*, 526 F.2d at 1366 (cautioning against expansion of the marital privileges exception on any basis other than "case-by-case.").

motives for making the video that were adduced at trial, the finding that the video constituted sexually explicit conduct was based on the actions taken in the video and Banks's later transmission of that video to a known pedophile with comments suggesting that the video was intended to show the child's erection. *See United States v. Freeman*, 498 F.3d 893, 901 (9th Cir. 2007) (holding error harmless when "it is more probable than not that the error did not materially affect the verdict") (citation omitted).

Banks argues that admission of the testimony constituted reversible error because he was required to change his trial strategy to explain his prior criminal history. However, there is no indication in the record that the district court relied at all on Banks's prior criminal history in reaching its guilty verdict, rendering any error harmless. *See id.*

**[12]** In sum, although the district court abused its discretion in admitting the contested testimony, such error was harmless and does not warrant reversal.

### D.   The district court's definition and finding of masturbation were not erroneous.

The district court conscientiously crafted a definition of masturbation. It first noted the fact that no statutory definition exists, before recounting a dictionary definition of masturbation that included the exciting of another's genitals by manual contact. Rejecting the government's assertion that masturbation may be found if the act were done solely "for the purpose of exciting the person performing the act," the court concluded that the act must be "for the purpose of exciting the person being masturbated."

The court next turned to the problem that this definition created when it came to the masturbation of a minor child who might not be able to be stimulated by the action. The district court concluded that Congress intended masturbation to

include "the stimulation, manipulation, or excitation of the genital organs for purposes of exciting or stimulating the person being masturbated if that person was an adult."

Banks argues that this definition impermissibly conflicts with the district court's later definition of lasciviousness because it considers the intent of the individual masturbating the minor child while the definition of lascivious considers the response intended in the person viewing the image. As discussed below, the definition of masturbation provided by the district court does not impermissibly contradict that given for lasciviousness. The catch-all nature of the term lascivious allows for the recognition that certain acts, because of their inherent sexual nature, can satisfy both lasciviousness and another more specific sexual act.

In interpreting a statute, we "must begin with the language of the statute itself." *Bowsher v. Merck & Co.*, 460 U.S. 824, 830 (1983) (citation omitted). As the district court aptly noted, neither the statute nor interpretive case law provides a definition of masturbation. "[I]n the absence of a statutory definition, a term should be accorded its ordinary meaning . . ." *Sherman v. U.S. Parole Comm'n*, 502 F.3d 869, 874 (9th Cir. 2007) (citation omitted). Definitions should be adopted that "give effect, if possible, to every word of the statute," *Bowsher*, 460 U.S. at 833 (citation omitted), and dictionary definitions are cognizable. *See United States v. Santos*, ___ U.S. ___, 128 S. Ct. 2020, 2024 (2008) (utilizing dictionary definitions).

The Oxford English Dictionary defines masturbation as "deliberate erotic self-stimulation" and provides an accompanying definition of mutual masturbation as the "stimulation of the genitals of one person by another in order to produce an orgasm without sexual intercourse." 9 Oxford English Dictionary 454 (2d ed. 1989). Webster's Third New International Dictionary similarly defines masturbation as "erotic stimulation involving the genital organs commonly resulting in

orgasm and achieved by manual or other bodily contact exclusive of sexual intercourse . . .” Webster’s Third New International Dictionary of the English Language Unabridged 1391 (1986).

Each definition focuses primarily on the “erotic” stimulation of one’s genitals. Despite noting that an orgasm is commonly reached or intended, neither definition requires that an orgasm occur or even be possible. The district court’s definition recognizes this aspect of masturbation in the difficult context of contact with a child too young to have a sexual response to the physical contact.

The subject video depicts the minor child having his diaper changed. Using a diaper wipe, Banks touched, rubbed and held the child’s penis. Banks also massaged the child’s scrotum and anus, and the time spent wiping the child’s anus appears prolonged. These actions were taken at a point in the diaper-changing where it could reasonably be concluded that they were extraneous. Indeed, after the cleaning process appeared complete, Banks exited the screen and returned two more times with new wipes and continued touching the child. In addition, messages between Banks and the Canadian pedophile demonstrated that Banks represented the video as depicting the child’s erection.

**[13]** This evidence supports the district court’s conclusion that the minor child’s genitals were stimulated for the purpose of producing a video for Banks to share with his fellow pedophile in Canada. Such an action would fit the definition of masturbation described above. Accordingly, the district court did not clearly err in concluding that the video depicts masturbation and, ultimately, sexually explicit conduct. *See Leos-Maldonado*, 302 F.3d at 1063 (reviewing the district court’s findings of fact for clear error).

*E. The district court's definition and finding of lasciviousness were not erroneous.*

The district court did not provide an explicit definition of lascivious when discussing whether the video constituted lascivious exhibition of the genitals or pubic area of the minor child. However, the court did note the following:

> An additional factor that I think could be added to the Dost factors would be the fondling of a child. And fondling is broader than masturbation. If the government has proved masturbation, in my view it has also proved the fondling of the child. And it was for the purpose of eliciting in the viewer a sexual response. And so the court finds that this image also . . . constitutes a lascivious exhibition of the genitals or pubic area of the child. . . . [I]t was created for the purpose of exciting Mr. Lindstrom and for the purpose of appealing to his prurient pedophilia [sic] interests.

Banks attacks this reasoning, complaining that the district court improperly folded the definition of masturbation into the definition of lasciviousness.

In the context of images involving children, the term "lascivious" has been fairly well defined. A lascivious exhibition is pornographic, even if not obscene, and is considered in the context of "the depictions . . . imposed . . . by the attitude of the viewer or photographer." *United States v. Arvin*, 900 F.2d 1385, 1391 (9th Cir. 1990). Accordingly, "applied to the conduct of children, lasciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or likeminded pedophiles." *United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir. 1987). This focus results in a definition of lascivious that criminalizes images "so presented by the

photographer as to arouse or satisfy the sexual cravings of a voyeur." *Hill*, 459 F.3d at 972 (citation omitted).

The district court's definition did not run afoul of this recognized definition of lascivious. The court's definition of masturbation required a finding that the contact with the minor's genitalia was of the type that would produce a sexual response in an adult. The court's discussion of lascivious displayed an awareness by the court that there must be an intent on the part of the photographer or viewer to satisfy a sexual desire through the image. Although the distinction between the terms is subtle, it nevertheless exists: masturbation focuses on the effect on the victim and lasciviousness focuses on the effect on the pedophile.

[14] The district court's factual determination that the video encompassed the lascivious exhibition of the minor child's genitals was predicated on the court's conclusion that the video depicted the masturbation of the minor child. Banks counters that the video's display of a diaper change and its failure to meet many of the factors articulated in *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986),[5] preclude a factual finding that the video contains a lascivious exhibition of the minor child's genitals. However, the *Dost* factors "are neither exclusive nor conclusive" because "a determination of lasciviousness has to be made based on the overall content of the visual depiction." *Hill*, 459 F.3d at 972 (citation, alteration and internal quotation marks omitted). Accordingly, the dis-

---

[5]The *Dost* factors are six considerations that judges may use as "a starting point . . . in determining whether a particular image is likely [to be lascivious]." *Hill*, 459 F.3d at 972. The six factors are "(1) whether the focal point . . . is on the child's genitalia . . . ; (2) whether the setting . . . is sexually suggestive . . . ; (3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child; (4) whether the child is fully or partially clothed, or nude; (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; [and] (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer." *Id.* at 971 (citations omitted).

trict court's failure to consider the factors explicitly, or to comment on the diaper-change setting of the video, is not dispositive. Rather, because the district court did not err in determining that the video depicted the masturbation of a minor child and because the recording of such an act constitutes the lascivious exhibition of the child's genitals, the court did not err in concluding that the video contains a lascivious exhibition of a minor child's genitals.

## IV.

## SUMMARY AND CONCLUSION

Despite Banks's objections, we hold that the search warrant issued in this case was adequately supported and sufficiently specific. Further, although the district court erred by overextending the exceptions to the marital communications privilege, the error was harmless in this case. Finally, the district court's definitions and findings regarding the terms "masturbation" and "lascivious" appropriately captured the requirements for each term as they related to the charges brought and did not impermissibly conflict with each other. Accordingly, we conclude that reversal of Banks's conviction is not warranted and affirm his conviction.

**AFFIRMED.**

---

ALARCÓN, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's conclusion that the district court did not err in denying Banks's motion to suppress the evidence seized pursuant to a search warrant, and in defining and applying the terms "masturbation" and "lascivious." I respectfully dissent from the majority's holding that the district court abused its discretion in admitting the testimony of Banks's

spouse that he told her he produced a video for distribution on the internet to other pedophiles that depicts him masturbating their two-year-old grandchild. I would affirm that ruling.

I am persuaded that the majority has erred in holding that the law of this Circuit precludes us from deciding a question it has not previously considered, i.e., whether the marital communications privilege is applicable to the voluntary testimony of a spouse concerning the statements of an accused that connect him to the sexual abuse of their grandchild. In so holding, the majority has neglected its duty pursuant to Rule 501 of the Federal Rules of Evidence to decide questions involving the applicability of the marital communications privilege on a case-by-case basis "in light of reason and experience."[1] The majority's remarkable finding that a grandchild is not the "functional equivalent of a birth or step-child," (Majority Opinion at 2235) will surely come as a complete surprise to grandparents.

# I

The majority has determined that "[o]ur governing precedent" in determining whether the marital communications privilege should apply to an accused's admission to his spouse of committing a crime against their grandchild is *United States v. White*, 974 F.2d 1135 (9th Cir. 1992). Major-

---

[1]Rule 501 reads as follows:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

ity Opinion at 2238. That issue was not before this court in *White*. Instead, this court addressed a discrete question in *White*, i.e., whether the district court abused its discretion in admitting the testimony of a spouse that the accused had threatened to kill her and her daughter. *White*, 974 F.2d at 1137.

In affirming the trial court's ruling that the spouse's testimony was admissible, we reasoned as follows:

> This court has counseled that the marital communications privilege must be narrowly construed because it obstructs the truth seeking process. Use of the privilege in criminal proceedings requires a particularly narrow construction because of society's strong interest in the administration of justice. The public policy interests in protecting the integrity of marriages and ensuring that spouses freely communicate with one another underlie the marital communications privilege. When balancing these interests we find that threats against spouses and a spouse's children do not further the purposes of the privilege and that the public interest in the administration of justice outweighs any possible purpose the privilege serves in such a case.

*Id*. at 1138 (quotation marks and citations omitted).

This court did not hold in *White* that the marital communications privilege should not apply to an admission by the accused to his or her spouse that he or she had sexually abused their grandchild. Without citation to any relevant language in *White*, the majority has erroneously construed that decision to limit the exception to the marital communications privilege in prosecutions for crimes against children to statements made by "the functional equivalents of parents." Majority Opinion at 2238. Our holding in *White* was limited as follows: a trial court can properly balance the admission of

the voluntary testimony of a spouse, regarding the threats by the accused to harm a stepchild, against the privilege that communications between spouses should be treated as confidential and inadmissible in a criminal proceeding to maintain marital harmony. *White*, 974 F.2d at 1138.

We held in *White* that the critical question in determining if the marital communications privilege should apply is whether or not the conduct is "inconsistent with the purposes of the marital communications privilege: promoting confidential communications between spouses in order to foster marital harmony." *Id.* Obviously, an admission to a spouse by the accused that he produced a video for distribution on the internet depicting his masturbation of their grandchild to other pedophiles would destroy the harmonious relationship of marital partners.

Indeed, the impact of Banks's admission that he abused their grandchild must have been emotionally devastating to his wife in view of her knowledge that "the [grand]child in question [was] the son of the very person [Banks] plead guilty to molesting and going to prison for in 1990." Transcript of Record at 371, *United States v. Banks*, Case No. 1:06-CR-00051-S-BLW-WBS. *See also* Indictment, Case No. 1:06-CR-00051-S-BLW, March 14, 2006.[2] After Banks pled guilty to sexually molesting their son, he was imprisoned for twelve years. Transcript of Record at 3, 371, *Banks*, Case No. 1:06-CR-00051-S-BLW-WBS.

## II

Any inquiry concerning the federal court's extension of a

---

[2]According to the indictment in this case, and testimony at trial, Banks was convicted in Ada County Case No. CR 16884 on two counts of Lewd Conduct with a Minor Under Age Sixteen, in violation of Idaho Code § 18-1508, for aggravated sexual abuse, sexual abuse and abusive sexual conduct on his 11-year old son.

testimonial privilege necessarily begins with Rule 501. The genesis of the language of Rule 501 can be traced to the Supreme Court's decisions in *Funk v. United States,* 290 U.S. 371 (1933) and *Wolfle v. United States,* 291 U.S. 7 (1934). The *Funk* decision tracks language from *Benson v. United States*, 146 U.S. 325 (1892). In *Benson*, the government called as a witness a codefendant whose trial had been severed from that of the accused. *Benson*, 146 U.S. at 335. Precedent appeared to require that the court declare the codefendant was not competent. *Id.* at 336 ("It is familiar knowledge that the old common law carefully excluded from the witness stand parties to the record, and those who were interested in the result; and this rule extended to both civil and criminal cases.") In *Benson*, the Supreme Court held that it was not "precluded by [precedent] from examining this question in the light of general authority and sound reason." *Benson,* 146 U.S. at 335. In reviewing the historical grounds for excluding a codefendent from testifying, the Supreme Court explained that

> [t]he courts were afraid to trust the intelligence of jurors. But the last fifty years have wrought a great change in these respects, and today the tendency is to enlarge the domain of competency and to submit to the jury for their consideration as to the credibility of the witness those matters which heretofore were ruled sufficient to justify his exclusion. This change has been wrought partially by legislation and partially by judicial construction.

*Id.* at 336.

Thus, because traditional reasons for holding a codefendant incompetent to testify against an accused were no longer deemed sound, the Court revised the rule, supporting its conclusion by citing a trend toward a rule against incompetency. *Id.* at 337 ("Legislation of similar import prevails in most of

the States. The spirit of this legislation has controlled the decisions of the courts . . .").

In *Funk*, the Supreme Court overturned the rule prohibiting spousal testimony in federal criminal trials. *Funk*, 290 U.S. at 387 (overruling, in part, *Hendrix v. United States*, 219 U.S. 79 (1911) and *Jin Fuey Moy v. United States*, 254 U.S. 189 (1920)). Citing *Benson*, the Supreme Court in *Funk* rejected the notion "that the courts, in the face of greatly changed conditions, are still chained to the ancient formulae and are powerless to declare and enforce modifications deemed to have been wrought in the common law itself by force of these changed conditions." *Funk*, 290 U.S. at 379. Instead, the Court held that the question should be "disposed of . . . in the light of general authority and sound reason." *Id*. at 380. Reviewing the early, common law rule that a spouse was incompetent to testify for an accused spouse, in *Funk* the Court reasoned as follows:

> The fundamental basis upon which all rules of evidence must rest — if they are to rest upon reason — is their adaptation to the successful development of the truth. And since experience is of all teachers the most dependable, and since experience also is a continuous process, it follows that a rule of evidence at one time thought necessary to the ascertainment of truth should yield to the experience of a succeeding generation whenever that experience has clearly demonstrated the fallacy or unwisdom of the old rule.

*Id*. at 381. The Court further explained that

> the exclusion of the wife's testimony, in the face of the broad and liberal extension of the rules in respect of the competency of witnesses generally, [can no longer be] justified, if it ever was justified, on any ground of public policy. It has been said that to

admit such testimony is against public policy because it would endanger the harmony and confidence of marital relations, and, moreover, would subject the witness to the temptation to commit perjury. Modern legislation, in making either spouse competent to testify in behalf of the other in criminal cases, has definitely rejected these notions, and in the light of such legislation and of modern thought they seem to be altogether fanciful. The public policy of one generation may not, under changed conditions, be the public policy of another.

*Id.* (citing *Patton v. United States*, 281 U.S. 276, 306).

In *Wolfle*, decided a year after *Funk*, the Supreme Court upheld a ruling by the Ninth Circuit that a husband's statement, made to his wife through the use of a stenographer, was not privileged, even though it was intended to be communicated to his wife.[3] *Wolfe v. United States*, 64 F.2d 566 (9th Cir. 1933). The Supreme Court held that evidentiary rules are "governed by common-law principles as interpreted and applied by the federal courts in the light of reason and *experience*." *Wolfe*, 291 U.S. at 12 (emphasis added). The examination of "general authority" as described in *Funk*, thus evolved into an assessment of "experience" in *Wolfle*. As part of its assessment of "experience," the Court in *Wolfe* reviewed various state court privilege rulings, some predicated on state statutes, and concluded that the defendant's statement was not protected by the privilege protecting marital confidences. *Id.* at 17.

It is indisputable that Congress endorsed inclusion of state law in directing federal courts to develop "common law prin-

---

[3]The stenographer testified that the defendant dictated a letter to his wife which contained the following reference to the Cantu Mine: "I am going to break in and whenever I do, I am going to rob every last one of them blind." *Id.*

ciples . . . in light of reason and experience" in enacting Rule 501. *See Jaffee v. Redmond*, 518 U.S. 1, 8 (1996) ("The authors of the Rule borrowed this phrase from our opinion in *Wolfle v. United States*, 291 U.S. 7, 12 (1934)"). In *Jaffee*, the court stated that "it is appropriate to treat a consistent body of policy determinations by state legislatures as reflecting both 'reason' and 'experience.' " 518 U.S. at 13.

The Supreme Court held in *Trammel v. United States*, 445 U.S. 40 (1980) that in "enacting Rule 501, Congress manifested an affirmative intention not to freeze the law of privilege." 445 U.S. at 47. Under Rule 501, federal courts are authorized to "develop[ ] . . . testimonial privileges in federal criminal trials governed by the principles of the common law as they may be interpreted . . . in the light of reason and experience." *Id.* In enacting Rule 501, Congress did not restrict development in the law of privilege to federal legislation, and declined to limit the range of possible privileges. Congress instead crafted Rule 501 in order to "provide the courts with the flexibility to develop rules of privilege on a case-by-case basis." *Id.* citing 120 Cong. Rec. 40891 (1974) (statement of Rep. Hungate). It was Congress' intent "to leave the door open to change." *Id*. After embarking on a comprehensive review of the history of the marital testimonial privilege, as well as the evolving trends in state law concerning the marital communications privilege, the Court noted that "support for the privilege against adverse spousal testimony ha[d] eroded" in recent years, and affirmed the lower court's ruling that the witness-spouse alone holds the privilege to refuse to testify adversely. *Id.* The Court noted in *Trammel* that

> [w]hen one spouse is willing to testify against the other in a criminal proceeding — *whatever the motivation* — their relationship is almost certainly in disrepair; there is probably little in the way of marital harmony for the privilege to preserve. In these circumstances, a rule of evidence that permits the accused to prevent adverse spousal testimony seems

far more likely to frustrate justice than to foster family peace.

*Id*. at 52 (emphasis added).[4]

The courts' intent to foster evolution in the area of testimonial privilege was reinforced more recently in *Jaffee*. In *Jaffee*, the Supreme Court held, for the first time, that communications within the psychotherapist-patient relationship are privileged. *Jaffee*, 518 U.S. at 8-9. In recognizing the new testimonial privilege, the Court insisted that reliance upon laws enacted by state legislatures should be used as a model for developing the common law of privilege pursuant to Rule 501 is entirely "appropriate." *See id*. at 13 ("In *Funk v. United States*, we recognized that it is appropriate to treat a consistent body of policy determinations by state legislatures as reflecting both 'reason' and 'experience.' ") (citation omitted). The Court explained

> [t]hat it is appropriate for the federal courts to recognize a psychotherapist privilege under Rule 501 is confirmed by the fact that all 50 States and the District of Columbia have enacted into law some form of psychotherapist privilege. We have previously observed that the policy decisions of the States bear on the question whether federal courts should recognize a new privilege or amend the coverage of an existing one.

*Id.* at 12 (citing *Trammel*, 445 U.S. at 48-50; *United States v. Gillock*, 445 U.S. 360, 368, n. 8 (1980)).

The Court reasoned in *Jaffee* that "[b]ecause state legislatures are fully aware of the need to protect the integrity of the factfinding functions of their courts, the existence of a con-

---

[4]The majority has failed to cite *Trammel* or discuss its duty not to freeze the law of privilege.

sensus among the States indicates that 'reason and experience' support recognition of the privilege." *Jaffee*, 518 U.S. at 13. The Court also noted that "[i]t is of no consequence that recognition of the privilege in the vast majority of states is the product of legislative action rather than judicial decision." *Id.* "The present unanimous acceptance of the privilege" by "state lawmakers" is persuasive proof of a solid social "consensus" that the psychotherapist-patient relationship merits the protection of an evidentiary privilege. *Id.* Thus, the stated policy underlying Rule 501 is served by consideration not only of state case law, but also laws enacted by the states in developing the law of privilege. The majority has failed to look to laws enacted by Idaho and other states that permit a spouse to testify regarding a spouse's admission in a state prosecution concerning sexual abuse of a minor child.

## A

The two primary assumptions underlying the recognition of testimonial privileges as articulated by the Court in *Jaffee* are that

> there is a general duty to give what testimony one is capable of giving, and, any exceptions which may exist are distinctly exceptional, being so many derogations from a positive general rule. Exceptions from the general rule disfavoring testimonial privileges may be justified, however, by a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth."

*Id.* at 9 (internal citations omitted) (quoting *Trammel*, 445 U.S. at 50-51 (holding that because "[t]estimonial exclusionary rules and privileges contravene the fundamental principle that 'the public . . . has a right to every man's evidence,' . . . they must be strictly construed")).

The traditional justification for a marital adverse testimonial privilege is that it serves the "public good" because forc-

ing one spouse to testify against another in a criminal case would lead to one of two unacceptable results: it could potentially cause a break up of the marriage if the witness spouse voluntarily inculpated her husband, or it could promote perjury. *See, e.g.*, *Clements v. Marston*, 52 N.H. 31 (1872). As explained by the court in *Clements:*

> At common law . . . [a]ny person not a party, if interested in the result of the suit, was excluded as a witness on the ground of interest. Wives were excluded, —1st, on the ground of interest, they being interested wherever their husbands were; and 2d, upon the ground of public policy, that it was not expedient to place husband and wife in a position that might lead to dissensions and strife between them, or that might encourage perjury. Hence, wives were not allowed to testify for or against their husbands when they were parties to civil proceedings, and, for the same reason, both were excluded when either was a party in a criminal case.

*Id.* at 37; *see also Trammel*, 445 U.S. at 44 ("The modern justification for this privilege against adverse spousal testimony is its perceived role in fostering the harmony and sanctity of the marriage relationship.").

**B**

Since *Trammel* was decided in 1980, courts, federal and state, and state legislatures, have continued to limit the marital communications privilege in obedience to the Court's direction that it "must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilization of all rational means for ascertaining the truth.' " *Id.* at 50 (*quoting Elkins v. United States*, 364 U.S. 206, 234 (1960) (Frankfurter, J. dissenting)). This trend undeniably demonstrates that

marital communications regarding the sexual abuse of a minor child are not protected because they are antithetical to society's concept of the marital relationship. In analyzing the question whether the marital communications privilege should apply to communications concerning crimes against the grandchild of an accused, it is not only instructive to review this evolving trend, it is required that we do so if we are to interpret "the principles of the common law . . . in the light of reason and experience." Fed. R. Evid. 501.[5]

In *United States v. Allery*, 526 F.2d 1362 (8th Cir. 1975), the Eighth Circuit held, in an opinion announced prior to the Supreme Court's decision in *Trammel*, "that a serious crime against a child is an offense against that family['s] harmony and to society as well." *Id.* at 1366. The court held in *Allery* that the marital facts privilege did not apply in a case where the defendant's step-child was the victim. *Id.* at 1367.

In *United States v. White*, 974 F.2d 1135 (9th Cir. 1992), this court cited *Allery* in extending the exception to the marital communications privilege to include statements relating to crimes against step-children. *White*, 974 F.2d at 1138. We held in *White* that "the marital communications privilege should not apply to statements relating to a crime where a spouse or a spouse's children are the victims." *Id*. We reasoned in *White* that "[p]rotecting threats against a spouse or the spouse's children is inconsistent with the purposes of the marital communications privilege: promoting confidential communications between spouses in order to foster marital harmony." *Id.* We also stated in *White* that because the marital

---

[5]In *Trammel*, the Supreme Court admonished federal courts to continue "the evolutionary development of testimonial privileges." 445 U.S. at 47. In other contexts, such as in Eighth Amendment cases, the Court has instructed that federal courts may give "great weight" to "objective evidence of contemporary values." *Kennedy v. Louisiana*, 128 S. Ct. 2641, 2658 (2008) (reviewing state statutes for "objective indicia of consensus" as to whether the death penalty is an appropriate punishment in cases of child rape).

communications privilege "obstructs the truth seeking process," its use "in criminal proceedings requires a particularly narrow construction because of society's strong interest in the administration of justice." *Id.*

In *United States v. Bahe*, 128 F.3d 1440 (10th Cir. 1997), the Tenth Circuit held that "we recognize an exception to the marital communications privilege for spousal testimony relating to the abuse of any minor child within the household." *Id.* at 1446. The Tenth Circuit reasoned as follows in *Bahe*:

> We see no significant difference, as a policy matter, between a crime against a child of the married couple, against a stepchild living in the home or, as here, against an eleven-year-old relative visiting in the home. Child abuse is a horrendous crime. It generally occurs in the home . . . and is often covered up by the innocence of small children and by threats against disclosure. It would be unconscionable to permit a privilege grounded on promoting communications of trust and love between marriage partners to prevent a properly outraged spouse with knowledge from testifying against the perpetrator of such a crime.

*Id.* at 1446 (citation omitted). Since we published our decision in *White*, a number of jurisdictions have held that an accused's statements to his spouse relating to crimes against children are admissable without limiting the exception to crimes against children of the marriage or of either spouse.

In *United States v. Martinez*, 44 F. Supp. 2d 835 (W.D. Tex. 1999), the district court held that "in a case where one spouse is accused of abusing minor children, society's interest in the administration of justice far outweighs its interest in protecting whatever harmony or trust may at that point still remain in the marital relationship." *Id.* at 836. "Reason and experience dictate that the marital communications privilege

should not apply to statements relating to a crime where the victim is a minor child." *Id.* (internal quotation omitted).

In *Fisher v. State*, 690 So. 2d 268 (Miss. 1996), the defendant challenged his conviction for the capital rape of his 11-year-old niece on the ground that the trial court erred in allowing his wife to testify that he admitted sexually abusing his niece to her. The Supreme Court of Mississippi interpreted Mississippi Rule of Evidence 504 (d) to except from the marital communications privilege testimony relating to crimes against *any* minor child. *Id.* at 272.

In *State v. Modest*, 88 Wn. App. 239 (Wash. Ct. App. 1997), the court held that under Rev. Code Wash. (ARCW) § 5.60.060, "the guardianship exception applies when any spouse acts *in loco parentis*, meaning when he or she assumes the parental character or discharges parental duties, even if for a very short time." *Id.* at 247-48. The Washington statute construed in *Modest* provided that communications between spouses are not protected by the marital privilege in a "proceeding for a crime committed by said spouse or domestic partner against any child of whom said spouse or domestic partner is the parent or guardian." Rev. Code Wash. (ARCW) § 5.60.060. The court in *Modest* considered "the paramount legislative intent to insure effective prosecutions for sexual crimes against children," and concluded that "[i]n light of this overriding concern, [the court] liberally interprets the word 'guardian' to punish child abusers and protect children from further mistreatment." *Id.*

In *State v. Countryman*, 572 N.W.2d 553 (Iowa 1997), the Iowa Supreme Court held that Iowa Code § 232.74, which prohibited the disclosure of communications between married persons, did not apply in a child abuse prosecution. *Id.* at 561.

In *Munson v. State*, 959 S.W.2d 391 (Ark. 1998), the defendant was charged with sexually assaulting his wife's 14-fourteen-year-old sister, who was visiting in their home when

the crime occurred. *Id*. at 392. Rule 504(d)(3) of the Arkansas Rules of Evidence sets forth an exception to the marital privilege when one spouse is charged with a crime against the person or property of a person "residing" in the household of either. Ark. R. Evid. 504(d)(3). The Supreme Court of Arkansas held in *Munson* that the victim in the case was "residing" in the accused's household because her "temporary residence with the Munsons presented the same opportunity to Mr. Munson he would have had if the victim intended to remain in the household indefinitely." *Id.* at 393.

In *Villalta v. Commonwealth*, 428 Mass. 429 (Mass. 1998), the Supreme Judicial Court of Massachusetts addressed the question whether the marital communications privilege applied to preclude the accused's spouse from testifying against her husband, who was charged with rape, indecent assault and battery, and assault and battery on a two-year-old girl. The child was unrelated to the wife or the husband. She periodically received day-care services from the accused's spouse in their home. *Id.* at 429-30. The trial court allowed Mrs. Villalta to invoke the marital communications privilege. *Id*. at 430. The trial court concluded Mass. Gen. Law Ann. ch. 233, § 20 was inapplicable when the alleged victim was not a child of either spouse and did not live with them. *Id.* The Supreme Judicial Court of Massachusetts disagreed. Section 20 provides that "except in any proceeding relating to child abuse, including incest, neither husband nor wife shall be required to testify in the trial of an indictment, complaint or other criminal proceeding against the other." Mass. Gen. Law Ann. ch. 233, § 20. The Supreme Judicial Court interpreted the statute as follows:

> We see no logical reason for the Legislature to deny the spousal privilege when a young victim of abuse is a child of one or both spouses (or other child closely related by consanguinity) but to perpetuate the privilege when the young victim is related to neither spouse. The abuse is the same. Society's interest

in convicting and punishing one who commits child abuse is the same. The threat to the preservation of the family unit arising from one spouse being compelled to testify against the other seems substantially identical in all instances. Indeed, if the defendant's alleged child abuse was not incestuous, the spouse's compelled testimony might be less threatening to the marriage than if she were compelled to testify, as the wife and defendant agree she must, concerning incestuous child abuse, which involves an even greater stigma than child abuse alone. The criminal conduct asserted in this case, abuse of the victim in the defendant's home, shows that the need for the testimony of a defendant's spouse may be as great as it would be if the alleged victim were their own child. We choose to apply the literal meaning of the words "child abuse" to § 20, cl. Second. Child abuse in common usage is not limited to the abuse of one's own child but means the abuse of any child.

*Id.* at 434-35.

In *J.S. v. R.T.H.*, 155 N.J. 330 (1998), a civil action was filed against the wife of a 64-year old man, who had pled guilty to criminally sexually assaulting two unrelated, adolescent neighbor girls — ages 12 and 15. *Id.* at 334. The parents of the children alleged the perpetrator's wife was liable for their physical and emotional injury, because she "was aware of her husband's history of pedophilia as well as his conduct involving these children." *Id.* at 335 n.1 (citing *J.S. v. R.T.H.*, 301 N.J. Super. 150 (App.Div., 1997)). The Supreme Court of New Jersey held that the defendant-wife could be held liable for her husband's criminal conduct if she knew of or should have known of his sexual proclivities but failed to warn others. *Id.* at 352.

Noting that the New Jersey legislature had dealt comprehensively with the subject of child abuse, and enacted statutes

designed to prevent the sexual abuse of children, the court commented that "it is the intent of this legislation to assure that the lives of innocent children are immediately safe-guarded from further injury and possible death and that the legal rights of such children are fully protected." *Id*. at 343. The court acknowledged that "[w]hile the interest in protecting children from sexual abuse is great, this Court must also take into consideration defendants' interests in a stable marital relationship and in marital privacy." *Id* at 345 (citing *State v. Szemple,* 135 N.J. 406, 414 (1994)). The court concluded, however, that "[t]he societal interest in enhancing marital relationships cannot outweigh the societal interest in protecting children from sexual abuse. The child-abuse reporting statute itself has mandated that balance—it applies to every citizen, including a spouse." *Id.* (citations omitted). "As the Appellate Division here described, 'the Legislature's adoption of that statute [i.e., "Megan's Law"] is an expression of New Jersey's strong public policy favoring protection of children over the privacy of an offending adult.' " *Id.* (citing 301 N.J. Super. at 157, 693). "Thus, '[t]he protective privilege ends where the public peril begins.' " *Id.* (citing *Tarasoff v. Regents of the Univ. of Cal.*, 17 Cal. 3d 425 (1976). The Supreme Court of New Jersey upheld the Appellate Division's decision to overrule *Rozycki v. Peley*, 199 N.J. Super. 571, 579 (Law Div.1984) "to the extent that it 'places a higher priority upon preserving the defendants' marital relationship than upon protecting children from abuse.' " *Id.* (citing 301 N.J. Super. at 157). The court explained its ruling as follows:

> This Court has recognized that the sexual abuse of children not only traumatizes the victims, but also exacts a heavy toll on society: Recent research indicates that a number of psychosocial problems—including chronic depression and anxiety, isolation and poor social adjustment, substance abuse, suicidal behavior, and involvement in physically or sexually abusive relationships as either aggressor or victim—are more common among adults molested as chil-

dren than among those with no such childhood experiences. Victims of sexual abuse can suffer an impaired ability to critically evaluate the motives and behavior of others, making them more vulnerable to revictimization. An especially disturbing finding about child sexual abuse is its strong intergenerational pattern; in particular, due to the psychological impact of their own abuse, sexually abused boys have been found to be more likely than non-abused boys to turn into offenders against the next generation of children, and sexually abused girls are more likely to become mothers of children who are abused. And studies show that adult male aggressive behavior, particularly sexual aggression, is associated with the trauma of childhood sexual abuse. Thus, apart from the substantial personal trauma caused to the victims of such crimes, sexual crimes against children exact heavy social costs as well.

*Id.* (citations omitted).

In *Huddleston v. State*, 997 S.W.2d 319 (Tex. App. Houston 1st Dist. 1999), the court upheld the trial court's admission of a spouse's testimony against her husband who was charged with raping the ten-year-old daughter of a neighbor. *Id.* at 321. The court held that "Rule 504(b)(4)(A) states that the privilege does not apply in any proceeding in which the person is charged with "a crime against the person's spouse, a member of the household of either spouse, or *any* minor." *Id*. (emphasis in original) (citing Tex. R. Evid. 504(b)(4)(A)). "The language of amended rule 504(b)(4)(A) makes it clear that the exception applies when the spouse is charged with a crime against *any* minor."[6] *Id*. (emphasis in original). *See also*

---

[6]There is ample statistical data concerning the increase in child sexual abuse. For example, "from 1976 to 1986, the number of reported cases of child sexual abuse grew from 6,000 to 132,000, an increase of 2,100%."

*Ludwig v. State*, 872 S.W.2d 771 (Tex. App. Waco 1994) (holding that a wife may testify against a husband charged with killing his nephew because the exception to the marital communications privilege involving crimes "against the person of any minor child or any member of the household of either spouse" included crimes against any minor child, whether or not the child of either spouse).

In *Brown v. State*, 359 Md. 180 (2000), the Court of Appeals of Maryland held that, pursuant to Md. Code Ann., Cts. & Jud. Proc. § 9-106, testimony concerning "the abuse of a child under 18" is exempted from the "non-compellability of a spouse to testify as an adverse witness in a criminal case." *Id.* at 197.

In *State v. Anderson*, 636 N.W.2d 26 (Iowa 2001), the Supreme Court of Iowa held that the exception to the marital communications privilege provided for in Iowa Code § 232.74 applies to cases of child abuse that result from acts or omissions of a care provider. *Id.* at 36-37. In § 232.68(7), a "person responsible for the care of a child" is defined as:

---

*Kennedy*, 128 S. Ct. at 2671 n.2 (Alito, J. dissenting) (citing A. Lurigio, M. Jones, & B. Smith, Child Sexual Abuse: Its Causes, Consequences, and Implications for Probation Practice, 59 Sep Fed. Probation 69 (1995) and Abuse & Incest National Network Statistics, online at http://www.rainn.org/get-information/statistics/sexual-assault-victims. Justice Alito, in his dissent, noted that "reported instances of child abuse have increased dramatically; and there are many indications of growing alarm about the sexual abuse of children." *Id.* at 2671; *see also* M. Elliott, K. Brown and J. Kilcoyne, Child Sexual Abuse Prevention: What Offenders Tell Us, *Child Abuse & Neglect*, 5, 579-594 (1995) (reporting that nearly 70% of child sex offenders have between 1 and 9 victims; at least 20% have 10 to 40 victims). More recent data is equally alarming. According to "Statistics Surrounding Child Sexual Abuse," found online at http://www.darkness2light.org/KnowAbout/statistics_2.asp: "The median age for reported abuse is 9 years old; more than 20% of children are sexually abused before the age of 8; nearly 50% of all victims of forcible sodomy, sexual assault with an object, and forcible fondling are children under 12; and, 30-40% of victims are abused by a family member." *Id.*

a. a parent, guardian, or foster parent; b. a relative or any other person with whom the child resides and who assumes care or supervision of the child, without reference to the length of time or continuity of such residence; c. an employee or agent of any public or private facility providing care for a child, including an institution, hospital, health care facility, group home, mental health center, residential treatment center, shelter care facility, detention center, or child care facility; or, d. any person providing care for a child, but with whom the child does not reside, without reference to the duration of the care.

*See* Iowa Code § 232.68(7).

In *Commonwealth v. Spetzer*, 572 Pa. 17 (2002), the Supreme Court of Pennsylvania reviewed the admissibility of communications between the accused and his wife concerning the rape of his step-daughter. The court stated that:

Even if it is assumed that the [statutory exceptions to the marital communications privilege specifically addressing child abuse do] not act directly to provide a broad child abuse "exception" to [the application of Pennsylvania's marital communications privilege] in criminal proceedings, it certainly affects what a spouse's "reasonable expectation" of continued confidentiality may be with respect to marital communications that reveal the previous or intended abuse and intimidation of a child.

*Id*. at 42. Accordingly, the court held that the accused who described to his wife his previous abuse of a child had no reasonable expectation under Pennsylvania law that such communication will "remain confidential." *Id.*

### C

Thirty-eight states, and the District of Columbia, have enacted legislation expanding, by statute or rule, exceptions to

the marital communications privilege. In twenty-six jurisdic-
tions, there is no privilege where the accused has been
charged with criminal abuse of *any child*, regardless of
whether there is a familial affiliation with the victim-child.
*See* Ariz. Rev. Stat. Ann. §§ 13-4062 & 13-604 (eliminating
the privilege in cases involving any "dangerous crime against
children" and "[s]exual conduct with a minor under fifteen
years of age"); Ark. Code Ann. § 12-12-518 (no marital privi-
lege shall prevent anyone from testifying concerning child
maltreatment); Colo. Rev. Stat. § 18-3-411(5) (2006) (no mar-
ital communications privilege in cases involving sexual
offenses, including sexual offenses against children); Conn.
Gen. Stat. § 46b-129a (2007) (eliminating the privilege in all
child abuse cases); Dist. Columbia St. § 22-4124 ("Laws
attaching a privilege against disclosure of communications
between spouses or domestic partners are inapplicable in
prosecutions . . . where the victim is a child"); Ga. Code Ann.
§ 24-9-23 (2007) (no privilege in crimes against any minor
child); Id. R. Evid. 504(d)(1) (eliminating privilege in all
child abuse cases) and Idaho Code Ann. §9-203 (precluding
use of the privilege in "any case of physical injury to a child
where the injury has been cause as a result of physical abuse
or neglect by one or both of the parents" and "any case of
lewd and lascivious condict or attempted lewd and lascivious
conduct where either party would otherwise be protected by
this privilege"); Ind. Code § 31-32-11-1 ("The privileged
communication between . . . the husband and wife . . .is not
a ground for excluding evidence in any judicial proceeding
resulting from a report of a child who may be a victim of
child abuse or neglect"); *State v. Johnson*, 318 N.W.2d 417,
439 (Iowa 1982) (holding that Iowa Code § 232.74 eliminates
the privilege in all cases involving child abuse); Ky. Rev.
Stat. § 620.050 ("the husband-wife . . . privilege . . . shall
[not] be a ground for refusing to report . . or for excluding
evidence regarding a dependent neglected, or abused child or
the cause thereof"); La. Rev. Stat. Ann. § 14:403(B) (2007)
(eliminating privilege in child abuse cases); Md. Code Ann.,

Cts. & Jud. Proc. § 9-106(a)(1) (2007) (eliminating the privilege in all child abuse cases); Mass. Gen. Laws. Ann. ch. 233, § 20 (eliminates the privilege in proceedings involving abuse of any child); Mich. Comp. Laws Ann. § 600.2162(c) (2007) (providing an exception to the marital privilege for offenses committed against any person under 18); Minn. Stat. § 595.02(1)(a) (2006) (eliminating the privilege in cases involving crimes against any child under the care of either spouse); Miss. R. Evid. 504(d)(1) ("no privilege . . . in a proceeding in which one spouse is charged with a crime against . . . any minor child"); Mo. Rev. Stat. § 546.260(2) (2007) (eliminating privilege in crimes against any minor); N.Y. Fam. Ct. Act § 1046(a)(vii) (2007) (eliminating the privilege in proceedings for child abuse or neglect); Ore. Rev. Stat. § 419B.040 ("the husband-wife privilege, shall not be a ground for excluding evidence regarding a child's abuse, or the cause thereof, in any judicial proceeding"); 23 Pa. Cons. Stat. Ann. § 6381 (2006) (eliminating privilege in child abuse cases); R.I. Ann. § 12-17-10 ("The husband or wife of any respondent in a criminal prosecution, offering himself or herself as a witness, shall not be excluded from testifying because he or she is the husband or wife of the repondent"); S.C. Code of Laws Ann. § 19-11-30 ("a husband or wife is required to disclose any communication, confidential or otherwise, made by one to the other during the marriage where the suit, action, or proceeding concerns or is based on child abuse or neglect, the death of a child, criminal sexual conduct involving a minor, or the commission or attempt to commit a lewd act upon a minor"); Tex. R. Evid. § 504 ("The privilege of a person's spouse not to be called as a witness for the state does not apply . . . [i]n any proceeding in which the person is charged with a crime against . . . any minor"); Va. Code Ann. § 19.2-271.2 (2007) (providing exception to the privilege in crimes where a minor is the victim); Wyo. Stat. Ann. § 14-3-210 (2007) (eliminating privilege in child abuse cases).

In addition, thirteen jurisdictions have passed legislation exempting from the marital communications privilege state-

ments concerning crimes against children who were in the care or custody of either spouse, or against any person, including any child, "residing" in the household of either. As discussed in *Munson, supra*, a child may "reside" in a household even if only there temporarily. *See* Del. R. Evid. 504(d)(3) ("no privilege . . . in a proceeding in which 1 spouse is charged with a wrong against . . . a person residing in the household"); Haw. R. Evid. 505(c)(1)(C) ("no privilege . . . in proceedings in which one spouse is charged with a crime against . . . a third person residing in the household"); Ky. R. Evid. 504(c)(2)(C) (no privilege in "any proceeding in which one spouse is charged with wrongful conduct against . . . [a]n individual residing in the household"); Me. R. Evid. 504(d) ("no privilege . . . in a proceeding in which one spouse is charged with a crime against . . . any person residing in the household"); N.D. R. Evid. 504 ("no privilege . . . in a proceeding in which one spouse is charged with a crime against . . . a person residing in the household"); Okla. Stat. Ann. tit. 12, § 2504 (2007) ("no privilege . . . in a proceeding in which one spouse is charged with a crime against . . . a person residing in the household"); Utah R. Evid. 502(b)(4)(C)(iii) (no privilege "[i]n a proceeding in which one spouse is charged with a crime . . . against . . . a person residing in the household"); Vt. R. Evid. 504(d)(3) ("no privilege . . . in a proceeding in which one spouse is charged with a crime . . . against . . a person residing in the household"); *People v. Eveans*, 660 N.E.2d 240, 246-47 (Ill. Ct. App. 1996) (citing 725 Ill. Comp. Stat. 5/115-16 and holding that the Illinois legislature "broadened the scope of the child interest exception to include the interests not only of the children of the testifying and accused spouses, but also the interests of any children in their care, custody or control"; Nev. Rev. Stat. § 49.295(2)(e)(2) (2007) (eliminating the privilege if the crime is against "a child in the custody or control of either spouse"); 42 Pa. Cons. Stat. Ann. § 5913 (2006) (providing exception to privilege "in any criminal proceeding against either [spouse] for bodily injury or violence attempted, done or threatened upon . . . any minor child

in [the] care or custody [of either spouse]"); Tenn. Code. Ann. § 24-1-201 (2007) ("privilege shall not apply to proceedings concerning abuse of . . . a minor in the custody of or under the dominion and control of either spouse"); Wash. Rev. Code § 5.60.060(1) (2007) (providing exception to privilege where either spouse or domestic partner is considered parent or guardian of victim).

In its opinion, the majority notes that several states, including Idaho, have enacted statutes "encompassing an even broader concept" than a limitation of the marital communication privilege to the "functional equivalent of a birth or stepchild," Majority Opinion at 2234-35. The majority has failed to explain, however, why it has ignored the fact that Idaho, and many other states, have adopted an exception to the marital communications privilege in prosecutions for crimes against children. The majority has also failed to consider or explain the paradoxical impact on the public's perception of the rule of law that will result from the fact that an accused's admissions of the abuse of any child are admissible in most state courts, but cannot be presented into evidence in the federal court across the street.

Most of the states within the Ninth Circuit have adopted laws that extend the marital communications exception beyond our holding in *White*. Indeed, Arizona, Idaho, Nevada, and Oregon have eliminated the privilege entirely where the communication relates to a crime against any child while in the custody or control of either spouse. *See* Ariz. Rev. Stat. Ann. §§ 13-4062 & 13-604 (eliminating the privilege in cases involving any "dangerous crime against children" and "[s]exual conduct with a minor under fifteen years of age"); Idaho Code Ann. §9-203 (precluding use of the privilege in "any case of physical injury to a child where the injury has been cause as a result of physical abuse or neglect by one or both of the parents" and "any case of lewd and lascivious conduct or attempted lewd and lascivious conduct where either party would otherwise be protected by this privilege"); Nev.

Rev. Stat. § 49.295(2)(e)(2) (2007) (eliminating the privilege if the crime is against "a child in the custody or control of either spouse"); Ore. Rev. Stat. § 419B.040 ("the husband-wife privilege, shall not be a ground for excluding evidence regarding a child's abuse, or the cause thereof, in any judicial proceeding").

The Washington legislature has created an exception to the privilege where either spouse or domestic partner is considered the parent or guardian of a child victim. Wash. Rev. Code. § 5.60.060(a) (2007). The Supreme Court of Washington held in *State v. Waleczek*, 90 Wn.2d 746 (1978) that a husband and wife who hosted a seven-year-old girl for an overnight sleepover (during the course of which she was sexually assaulted), were considered "guardians" under Wash. Rev. Code § 5.60.060(1). *Waleczek*, 90 Wn.2d at 753. In *Waleczek*, the court explained:

> Defendant and his wife voluntarily undertook duties that are normally characterized as parental: They agreed to let Theraesa sleep at their house, wake her up in the morning, provide her with breakfast, and make sure she went to school. In addition, we have no doubt that Theraesa, being only 7 years old, would trust, respect, and obey defendant and his wife principally because she had been left in their care by her own mother.

*Id.*

In California, the legislature has created an exception to the marital communications privilege when a spouse is charged with "[a] crime against the person or property of the other spouse or of a child, parent, *relative*, or cohabitant of either." Cal. Evid. Code § 972(c)(1) (emphasis added). Hawaii has eliminated the privilege "in proceedings in which one spouse is charged with a crime against . . . a third person residing in the household." Haw. R. Evid. 505(c)(1)(C).

The statutes in Arizona, Idaho, Nevada, and Oregon have unambiguously eliminated the privilege entirely where the communication relates to a crime against any child while in the custody or control of either spouse. The majority has failed utterly to discuss the impact of state-created exceptions to the marital communications privileges or "recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." *Shadur*, 664 F.2d at 106. In declining to consider the evolutionary development of the law throughout the United States rejecting the marital communications privilege where the victim of a spouse's crime is their grandchild, the majority has cobbled together an amorphous standard that limits the exception to the functional equivalent of a child or stepchild. This undefined concept will no doubt baffle anyone who tries to apply it.

## CONCLUSION

In explaining its reasons for admitting the testimony of Banks's spouse concerning his admission that he produced the video depicting the crime Banks committed against his grandchild, the district court, unlike the majority in this matter, scrupulously fulfilled its duty to apply Rule 501 as interpreted by the Supreme Court in *Trammel*. The district court reasoned as follows:

> The question then is under those relevant facts, does the exception to the marital communications privilege apply? And does the court extend or interpret the Ninth Circuit's decision in *White* to apply to those circumstances? In making that determination, you have to look to the reasons for the privilege. And the reasons for the privilege are discussed by the Ninth Circuit in *White*.
>
> First of all, the Ninth Circuit cautions us that the privilege must be narrowly construed because it

obstructs the truth seeking process. And they say the use of the privilege in criminal proceedings requires a particularly narrow construction because of society's strong interest in the administration of justice.

The public policy reasons for the privilege are to protect the integrity of marriages and insure that spouses are able to freely communicate with each other. There has to be somebody that you can go to to bear your soul. But the privilege says if it isn't your priest, if it isn't your lawyer, it's your spouse.

But when you balance the interests involved, the court in *White* found that threats against the spouse or the spouse's children don't further the purposes of the privilege. Likewise, abuse of the spouse or abuse of the spouses' children don't further the privilege. It doesn't further the privilege to allow someone to talk about abusing the spouse or the spouse's children with impunity. It doesn't further the sanctity of the marriage or the family relationship.

Well, when you have grandchildren who under the facts of this case have that kind of relationship to the grandparents, it is not even a small step from what the court ruled in *White*. It is almost exactly the same.

Transcript of Record at 501-02, *Banks*, Case No. 1:06-CR-00051-S-BLW-WBS.

The district court also noted "that in determining the principles of the common law as they are interpreted in the courts of the United States in light of reason and experience, the court looks to the state laws of not just Idaho but other states for the reasoning in those decisions and statutes and the experience in those states." *Id.*

I would affirm the district court's well-reasoned assessment of common law jurisprudence and the law of Idaho and other states regarding the child victim exception to the marital communications privilege. Accordingly, I respectfully dissent from the majority's holding that an accused's admission to his spouse that he produced a video depicting his masturbation of their grandchild was inadmissible under Rule 501.